[Civ. No. 65427. Second Dist., Div. One. June 12, 1984.]

DAVID E. PURDY et al., Plaintiffs and Appellants, v.
PACIFIC AUTOMOBILE INSURANCE COMPANY,
Defendant and Appellant;
ROGER W. ROBERTS et al., Defendants and Respondents.

**COUNSEL**

Richard R. Clifford and Arthur E. Schwimmer for Plaintiffs and Appellants.

Edward L. LeBerthon and Gerald H. B. Kane, Jr., for Defendant and Appellant.

Chase, Rotchford, Drukker & Bogust, William C. Falkenhainer, Toni Rae Bruno, Timothy J. Swift, Lewis, A'Amato, Brisbois & Bisgaard, Roy M. Brisbois, Frank W. Spees, Jr., and Mark E. Goodfriend for Defendants and Respondents.

## OPINION

**HANSON (Thaxton), J.**—Action by and on behalf of an insured against an insurer for breach of the covenant of good faith and fair dealing contained in the insurance contract.

### BACKGROUND

Plaintiffs David E. Purdy and Thomas C. Wood, trustee for David E. Purdy, bankrupt, filed a complaint alleging bad faith refusal to settle and professional negligence (legal malpractice). Named as defendants were the insurer, Pacific Automobile Insurance Company, a corporation (hereinafter Pacific), and Pacific's attorney, Roger W. Roberts, as well as two law firms in which Roberts was a partner during the actionable events, Parker, Stanbury, McGee and Roberts and Roberts, Mead & Harrison, and various Does.

The complaint pleaded four causes of action. In the first cause of action, plaintiff Wood, as plaintiff Purdy's bankruptcy trustee, sought compensatory damages for the alleged breach by Pacific resulting in economic loss by Purdy. The second cause of action, by plaintiff Purdy, also against Pacific, sought both compensatory damages for the emotional distress suffered by Purdy because of the breach, and punitive (exemplary) damages.

In the third cause of action, plaintiff Wood, as plaintiff Purdy's bankruptcy trustee, sought to hold the insurer's attorneys (hereinafter referred to as Roberts or the Roberts group) liable for compensatory damages, i.e., the economic loss sustained by Purdy due to the insurer client's refusal to settle. In the fourth cause, plaintiff Purdy sought compensatory damages for the emotional distress assertedly caused by the activities of the Roberts group in connection with their insurer client's refusal to settle.

Prior to trial of the case, John P. Stodd was substituted for Wood as Purdy's bankruptcy trustee and a party plaintiff. The trial court granted defendant Pacific nonsuit on Purdy's second cause of action against it for noneconomic, personal damages and for punitive damages. The trial court also granted defendant lawyers, the Roberts group, nonsuit on both the third and fourth causes of action by Purdy's trustee and Purdy alleging professional negligence. Only the first cause of action, by the plaintiff bankruptcy trustee, was submitted to the jury.

The jury awarded the plaintiff trustee, Stodd, $225,000 in compensatory damages and interest at the legal rate; the verdict thus totalled $341,900.

## THE APPEALS

Pacific appeals from the jury verdict rendered in the case at bench. We affirm that verdict.

Plaintiff trustee, Stodd, appeals from the trial court's ruling granting nonsuit to the Roberts group on his cause of action for professional negligence. We also affirm that ruling.

Plaintiff Purdy appeals from the trial court's ruling precluding him from asserting a claim for emotional distress and for punitive damages against Pacific. We reverse the trial court's determination in this regard.

Finally, Purdy appeals from the trial court's grant of nonsuit to the Roberts group with respect to Purdy's claim against them for emotional distress damages. That ruling we affirm.

## FACTS

We view the facts giving rise to this litigation, as we must, in the light most favorable to sustaining the jury verdict rendered below.

We note that defendant Pacific has not directly challenged the sufficiency of the evidence supporting the verdict.

On Saturday, May 15, 1970, plaintiff Purdy, Marion "Buck" Partin, and various members of their respective families, went for an overnight campout on a dry lake in San Bernardino County. These two men had known each other since childhood in Missouri, and had renewed their association in California when both were employed by Philco-Ford in Newport Beach.

The campers arrived at the southwest end of Saugy Dry Lake in the late afternoon, and set up camp. Purdy had driven to the lake on Partin's motorcycle, but once there commenced operation on the dry lake bed of a motorcycle he had never driven before, a Yamaha owned by Carl Partin, Buck's cousin. Buck mounted a Harley-Davidson motorcycle owned by George Henricks, and also drove out on the dry lake bed. Neither Purdy nor Partin were wearing helmets. The two motorcycles collided violently; both men were injured, but more particularly Partin, who sustained severe and permanent injuries, including brain damage.

Both men suffered some degree of amnesia after the accident, and there was initial difficulty in determining how the collision had occurred. There were no actual eyewitnesses to the accident.

On May 5, 1971, Partin filed suit against Purdy, Carl Partin (the owner of the Yamaha) and Carl Partin's business, Partin Limestone Products, Inc. Partin was insured for liability by defendant insurer, Pacific. The policy limit was the sum of $100,000. Upon commencement of the Partin suit, Carl Partin notified Pacific, and Pacific undertook the defense of all three defendants named therein. Pacific's claims manager, Kenneth Bonar, was in charge of the matter. He hired Attorney Roger W. Roberts and his firm, Parker, Stanbury, McGee and Roberts, to defend. Pacific had obtained a statement from Purdy on November 16, 1970, in which Purdy declared that he and Partin had separated on the lake bed and that Purdy had been heading back toward the campsite at the southwest end of the dry lake when the collision occurred. Purdy was suffering from some retrograde amnesia, and did not remember seeing Partin just before the collision. A supplemental statement was taken from Purdy on December 7, 1971. In it, Purdy declared that he was heading back toward the campsite, driving southwest, when he heard Partin's cycle behind him, and heard it accelerate just before the two motorcycles impacted. Purdy gave a similar account in his deposition. Purdy's version of events was the foundation for the defense theory that Partin had caused the accident by accelerating and cutting in front of Purdy just before the collision.

However, it became abundantly clear by November 1972, when Partin's attorney made his first demand for settlement at policy limits, that Purdy's version of events was not supported by a substantial body of other evidence that had become known to Pacific. There appeared to be a gap in time, between Purdy's last recollection of heading back toward the camp and the collision. A number of witnesses who did not observe actual impact, nevertheless placed the collision point at the western side of the lake, and recalled that both drivers were headed away from the campsite, not toward it, at the time of the accident. The accounts of these witnesses were supported by a photograph taken of the tracks of the two cycles and the angle of impact.

On November 3, 1971, Pacific received the most comprehensive account to date of the accident, in a statement given by Garold Partin. Partin declared that prior to the accident, both cycles were headed away from the campsite; that Partin was *ahead* of Purdy on the Harley-Davidson and was driving at a moderate rate of speed, while Purdy was travelling much faster on the Yamaha. The collision had occurred, according to Garold Partin, when Purdy's vehicle overtook the Partin vehicle; this witness had observed the point of impact, on the left of the Harley-Davidson right behind the driver's seat. The seat had in fact been pushed up, as if the wheel of the Yamaha had struck it.

Garold Partin's statement was the subject of a letter written by Pacific's Bonar to Pacific's attorney, Roberts, in November 1971. Bonar conceded

that Garold Partin's account was very revealing about what had actually occurred at Saugy Lake. Attorney Roberts concurred in this estimate; in a letter to Bonar on November 14, 1971, Roberts declared that it appeared that Purdy had overtaken Partin and had in fact caused the collision by misjudging the distances involved.

Garold Partin's account of the accident was validated in May 1972 in a report of Truesdail Laboratories, Inc., the expert accident reconstruction firm retained by Pacific. On May 30, 1972, Attorney Roberts noted this fact in a letter to Bonar.

It had long been apparent that due to Partin's severe injuries that any jury verdict for Partin would greatly exceed the $100,000 limit. Attorney Roberts had at least twice, in letters to Bonar dated September 30, 1971, and January 25, 1972, referred to this state of affairs, as evidence was accumulating that the defense theory was incorrect and the possibility that Partin would be found contributorily negligent was diminishing.

A mandatory settlement conference on the Partin-Purdy suit was held on November 15, 1972, and was attended by both Bonar and Roberts. Partin's attorney offered to settle the entire claim for the policy limits of $100,000. Bonar, who had the authority to settle to the policy limits, refused to do so.

Shortly thereafter, Bonar discovered that Partin's counsel had deposed Truesdail Laboratories' engineer, Ralph Engdahl, learning that Engdahl had come to the conclusion that Partin had not been contributorily negligent, but that Purdy had caused the accident. Partin's counsel had Engdahl served with a subpoena for trial.

The second offer of settlement was made by Partin's attorney in a letter to Attorney Roberts on December 11, 1972. Bonar instructed Roberts to refuse to settle, and Roberts communicated the refusal to Partin's counsel by letter dated December 21, 1972. Pacific refused to settle, even though it now appeared that the opinion of their expert Engdahl about how the accident had occurred was shared by another expert hired by Partin, Fred Cady of Blewett & Associates. Bonar testified at trial that even knowing that Purdy's account of the accident would be disputed by two experts on accident reconstruction, he was still confident that "some" expert would be found by Attorney Roberts to support Purdy's version of events.

The third and final offer of settlement was made by Partin's counsel at a chambers conference on January 15, 1973, just prior to the commencement of trial. Bonar refused to settle. Attorney Roberts made a strategic attempt

to obtain bifurcation of liability from the other issues in litigation, but failed.

The case went to trial, and on February 2, 1973, the jury returned a verdict for Partin against Purdy in the sum of $325,000. Judgment was entered February 5, 1973. Bonar continued to reject the idea that Purdy had been responsible for the accident, and sought a new trial. When that was denied, Pacific took an appeal from the judgment, a judgment subsequently affirmed by the Court of Appeal on January 13, 1975. Pacific ultimately paid the $100,000 sum but that left the major part of the judgment outstanding against Purdy. (Carl Partin's liability was limited to $15,000, as the owner of the vehicle involved in the collision).

Expert testimony was presented at the present trial below concerning Pacific's refusal to settle by an experienced personal injury defense lawyer, David Canter, and by claims analyst Kenneth McBride. These experts were of the opinion that by the time the *first* offer of settlement was made, in November 1972, it was clear from the evidence already gathered and known to Pacific that a verdict for Partin in excess of the policy limits was highly probable, and that Pacific's refusal to settle at that time or thereafter was not reasonable.

There was also considerable testimony at the present trial indicating that Purdy was never told of the first offer of settlement; was told of the second offer only shortly before it expired and was not given an opportunity to express any opinion about that offer; was never advised of the accumulated evidence that he, not Partin, had been responsible for the accident; and was never advised of the third and final offer of settlement. Just prior to trial, on January 2, 1973, Attorney Roberts had received a letter from Purdy, dated December 28, 1972, in which Purdy requested "very strongly" that the case be settled within policy limits. Bonar was advised of Purdy's position, but testified that knowing that Purdy wanted the litigation ended had no impact on his evaluation of the situation.

Purdy testified at trial concerning his long friendship with Partin, both in Missouri and California. The verdict rendered against Purdy, memorialized the fact, as it were, that Purdy was responsible for Partin's severe injuries. This was very distressing to Purdy. He stated that, "It hurt then, and it hurts now, and it always will." After the verdict, Purdy testified, he was shunned by friends and coworkers the two men had had in common.

Purdy, also injured in the accident, was unable to work and in 1971 lost his job at Philco-Ford. By the time of trial, in January of 1973, he was about $7,000 or $8,000 in debt, but even after the adverse judgment he had

no intention of filing bankruptcy. In September 1972, he began new employment as a district manager for a newspaper, supervising about 50 carriers.

Purdy testified that in October 1974, he learned that although the appeal was still pending in *Partin* v. *Purdy,* the balance of the judgment unpaid could be enforced by Partin against any assets Purdy had at any time. On October 30, 1974, Purdy reluctantly filed his petition to be adjudicated a bankrupt, and listed the Partin judgment as the major outstanding debt. Purdy testified that had it not been for the Partin judgment, he never would have found it necessary to declare bankruptcy, but there was simply no way that he could pay off even a portion of the outstanding judgment owed to Partin. There was further testimony by Purdy that the fact of his bankruptcy filing had caused him humiliation and anxiety in connection with his present employment, and that he had difficulty thereafter in obtaining ordinary credit.

## PACIFIC'S APPEAL

■ The suit by Purdy's trustee and Purdy against Pacific was based upon principles explained in *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940-941 [132 Cal.Rptr. 424, 553 P.2d 584], as follows: "This court has observed that '[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement' [citation], that this principle is applicable to insurance policies, and that 'the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty' [citation]. [¶] More specifically, the insurer must settle within policy limits when there is substantial likelihood of recovery in excess of those limits. [Citations]." ■ If the insurer breaches the duty to settle, the insurer is liable to the insured for the consequences of the breach.

As we noted earlier, Pacific does not challenge the sufficiency of the evidence supporting the jury's verdict for Purdy's trustee, but on appeal has presented an elegantly constructed but highly technical argument directed toward overturning that verdict.

■ Pacific argues that Purdy's trustee had no standing to sue Pacific, because the trustee did not succeed to a sufficiently perfected cause of action, at the time Purdy filed his bankruptcy petition. Pacific characterizes Purdy's claim against Pacific as of the date of filing, "inchoate," "contingent"—because the appeal in *Partin* v. *Purdy* was still pending at that time and the Partin judgment was not in fact affirmed until January 1975—some

three months after Purdy sought relief from the judgment by filing the bankruptcy petition.

Section 70a of the Bankruptcy Act, as it read in 1974, provided that "The trustee of the estate of a bankrupt . . . shall . . . be vested by operation of law with the title of the bankrupt as of the date of the filing of the petition initiating a proceeding under this title . . . to all of the following kinds of property wherever located . . . (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred . . . (6) rights of action arising upon contracts . . . ." (Former 11 U.S.C. § 110(a).)

The United States Supreme Court has approved a very broad definition of the property interests of a bankrupt deemed to pass to his trustee, encompassing all claims that could reasonably be regarded as having roots in the prebankruptcy past. (*Segal* v. *Rochelle* (1966) 382 U.S. 375 [15 L.Ed.2d 428, 86 S.Ct. 511]; *Kokoszka* v. *Belford* (1974) 417 U.S. 642 [41 L.Ed.2d 374, 94 S.Ct. 2431].) The rationale for liberality in cases where a claim may not have fully ripened at the time of filing the bankruptcy petition is based on concern for the creditors of the bankrupt and concern for the bankrupt as well, the individual seeking a fresh financial start.

It is well settled, of course, that federal courts determining such matters as the "transferability" of property rights including causes of action in bankruptcy cases, look to state law for resolution of such issues. (*Segal, supra,* 382 U.S. 375, 381, fn. 6 [15 L.Ed.2d 428, 433].) Pacific relies on California's Civil Code section 1045, which provides that, "A mere possibility, not coupled with an interest, cannot be transferred," and points to *Nationwide Ins. Co.* v. *Superior Court* (1982) 128 Cal.App.3d 711, 715 [180 Cal.Rptr. 464], which upheld the dismissal of a failure to settle suit on the grounds of prematurity, because the underlying judgment in the initial case had not been finalized on appeal.

█ There is no question, under California law, that a fully perfected cause of action for failure to settle a claim sounds in both tort and contract (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032]), is assignable (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661-662 [328 P.2d 198, 68 A.L.R.2d 883]; *Murphy, supra,* 17 Cal.3d 937) and passes to the bankruptcy trustee from an aggrieved insured (*Brown* v. *Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679 [319 P.2d 69, 66 A.L.R.2d 1202]). █ The only issue is whether the "prematurity" of the claim defeats transferability in the context of the present case. We hold that it does not, for the following reasons:

(1) Upholding transferability of claim such as this one, one that is likely to be perfected during the bankruptcy proceedings, is more consistent with federal bankruptcy policy and this state's equally important concern for both creditors and the bankrupt.

(2) The term "final," when used in connection with judgments and legal proceedings admits to more than one meaning; it is not fixed in stone but may be used differently in different contexts. (See, e.g., *Larraburu Bros., Inc.* v. *Royal Indem. Co.* (9th Cir. 1979) 604 F.2d 1208, 1214-1215.) It conveys a different underlying concern, for example, to require that appeal be taken from a "final" judgment than that requiring that a final judgment be rendered favorable to the plaintiff in a subsequent malicious prosecution action. In the case at bench, it seems both sensible and just to regard Purdy's claim during the pendency of the Partin appeal and at the time he filed his bankruptcy petition as *a viable claim subject to possible divestiture,* rather than as a mere contingency. There was certainly nothing "contingent" about the possibility faced by Purdy that Partin would (with respect to the non-bonded portion of the judgment) levy on any assets possessed by Purdy that became known to Partin.

(3) Finally, principles of equity and justice support our determination here. Purdy's bankruptcy was *brought about* by Pacific's failure to meet its legal responsibilities. To allow Pacific to use the timing of Purdy's declaration of economic disaster to avoid ultimate liability would, in our view, constitute a travesty of justice. The situation was succinctly described in the concurring opinion in *Palmer* v. *Travelers Insurance Company* (5th Cir. 1963) 319 F.2d 296, 300, as follows: "Any other result [than allowing prosecution of the action by the trustee] would be to allow an insurer to default, drive its assured to the wall of bankruptcy, and then blithely advise the estate, the trustee, the assured and all of the creditors that while its duty was breached, there is nothing to be done about it. . . ."

In summary, we hold that Purdy had an existing, transferable property right, i.e., a cause of action for failure to settle, against Pacific, which was assumed by Purdy's trustee and appropriately prosecuted to judgment. Pacific's contention to the contrary fails.

Pacific contends that because its insured, Purdy, was insolvent or judgment proof at the time the excess judgment was entered, he suffered no economic damage from Pacific's breach of duty, and therefore, recovery by his trustee should be barred. Pacific claims there are diverging views in the United States concerning the so-called "prepayment rule," a doctrine requiring an insured to have *paid* the excess judgment or other expenses before recovering from the insurer; that while California favors a more liberal

rule, where an insured has been adjudicated a bankrupt, as Purdy was, there would be no damages to recover. (*Shapero* v. *Allstate Ins. Co.* (1971) 14 Cal.App.3d 433 [92 Cal.Rptr. 244].)

The "prepayment rule" has in fact been relegated to the past in a majority of American jurisdictions, due primarily to the perceived inequity of an insurer's being permitted to capitalize on the weakened financial condition of the insured, a condition to which the insurer had contributed, if not caused. In California, damages in the amount of the excess judgment are, without further demonstration, the measure of recovery for bad faith failure to settle. (*Brown* v. *Guarantee Ins. Co., supra,* 155 Cal.App.2d 679, 689-692.) Prepayment is not required.

Pacific argues that due to the bankruptcy adjudication, Purdy suffered no economic damage, an argument which ignores the impact of a discharge in bankruptcy on Purdy's future financial dealings and ignores the potential recovery by Partin and other creditors which would be precluded by the adoption of such a position. Pacific's contention, therefore, fails.

Finally, Pacific claims that there was prejudicial misconduct by plaintiff's counsel, unchecked by the court and requiring reversal of the jury verdict. This claim was presented when Pacific sought a new trial below, and was rejected. We affirm the trial court's ruling in this regard. Pacific complains that certain questions put to witnesses by plaintiff's counsel contained false assumptions concerning the duties owed by an insurer to an insured. The record shows that the trial court carefully instructed the jury by means of an instruction approved by Pacific as to what duties an insurer did not owe to the insured; the trial court also gave adequate instructions as to those duties an insurer did owe to an insured. Nor could plaintiff's counsel be faulted for referring in closing argument to facts obvious to the jury—that Purdy's trustee was claiming the recovery on behalf of Purdy's creditors. Nor did the jury respond to any invitation given to make an example of Pacific. The record of this long, hard-fought litigation simply does not support the charge that the jury was confused, misled, or acting on the basis of passion or prejudice.

Consequently, Pacific's appeal from the judgment must fail. We affirm the jury's verdict.

## THE LEGAL MALPRACTICE ACTIONS

Both plaintiff Purdy and his plaintiff trustee have appealed from adverse judgments rendered below concerning their causes of action for professional negligence (legal malpractice) against Pacific's attorney, Roberts, and the

law firms in which he was a partner during the actionable events. (Attorney Roberts changed his partnership arrangements shortly before the third and final offer of settlement was rejected by Pacific). The liability of these lawyer defendants, if any, for the harm asserted encompasses all of them (*Cline v. Watkins* (1977) 66 Cal.App.3d 174 [135 Cal.Rptr. 838]); our discussion of the primary issue presented and our disposition thereof, has application to all.

Both plaintiffs specifically alleged that the gravamen of their complaint against the lawyers for Pacific was that they had "negligently failed to effectuate a settlement" of the Partin suit, and that had they performed with professional skill at the standard required of them, the settlement would have been made and the harm avoided. ■ The trial court awarded the lawyer defendants judgment on the pleadings against plaintiff trustee, and nonsuited Purdy on his cause against the lawyers at the conclusion of his evidence. Thus, the standard of review in this court compels us to view the record in a light most favorable to the plaintiffs; as was explained in *Ewing v. Cloverleaf Bowl* (1978) 20 Cal.3d 389, 395 [143 Cal.Rptr. 13, 572 P.2d 1155], every legitimate inference which can be drawn from the evidence presented on Purdy's behalf must be, and the trial court's ruling can only be sustained if there was no evidence that would support a jury verdict in his favor. ■ Judgment on the pleadings compels a similar duty, in terms of viewing properly pleaded facts as true. However, as we shall discuss, resolution of the issue raised here is more an issue of law than of fact.

There is considerable argument in the briefs concerning the nature of the action brought by a client against his lawyer for legal malpractice, i.e., whether it sounds in contract or in tort. ■ It is elementary that the *relationship* between a client and his retained (or noncourt-appointed) counsel arises from a contract, whether written or oral, implied or expressed (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 181 [98 Cal.Rptr. 837, 491 P.2d 421]), and places upon the attorney fiduciary obligations to the client of the highest character, including the duty to counsel the client and conduct representation of the client with the requisite amount of skill. It is conceivable, too, that a client and his attorney may enter into a contract with very specific provisions which may be breached by one or the other. The nature of an action brought concerning an attorney-client relationship may vary, depending on the particular circumstances. (*Gunn v. Mahoney* (1978) 95 Misc.2d 943 [408 N.Y.S.2d 896].)

■ In California, however, the cause of action most commonly brought for an attorney's breach of professional duty to a client sounds more in tort than in contract, and the elements required for successful prosecution of such an action are stated in terms of negligence, a tort, rather than in con-

tractual terms. ■ Thus, in *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433], it was said that "The elements of a cause of action in tort for professional negligence are: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]" Where an attorney has one client, the attorney's acts or omissions are ordinarily not difficult to ascertain. ■ In addition, an attorney may be liable under certain circumstances, for foreseeable harm to third persons arising from his activities undertaken for a client. (*Roberts* v. *Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901].)

In the case at bench, however, there were in fact two clients, the insurance carrier and the insured. ■ We recognize that traditionally, where an insurance carrier is called upon to defend its insured, the attorney retained by the carrier for this purpose owes the same fiduciary duty to the insured as he or she would had the insured made the selection of counsel. The attorney's primary duty has been said to be to further the best interests of the insured. (*Gruenberg* v. *Aetna Ins. Co.*, *supra*, 9 Cal.3d 566, 582; *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.* (7th Cir. 1976) 536 F.2d 730, 737.)

In *American Mut. Liab. Ins. Co.* v. *Superior Court* (1974) 38 Cal.App.3d 579, 592 [113 Cal.Rptr. 561], the "triangular" aspect of the representation afforded the insured by the insurer's lawyers is described as a coalition for a common purpose, a favorable disposition of the claim—with the attorney owing duties to both clients. ■ As a practical matter, however, there has been recognition that, in reality, the insurer's attorneys may have closer ties with the insurer and a more compelling interest in protecting the insurer's position, whether or not it coincides with what is best for the insured. (See *U. S. Fid. & Guar. Co.* v. *Louis A. Roser Co.* (8th Cir. 1978) 585 F.2d 932, 938, fn. 5.)

The problem arises when the attorney knows, or should know, that a conflict has appeared between the insurer and the insured as to the most beneficial course of action indicated by the developing circumstances. It has long been the law in this state that when a conflict develops, the *insurer* cannot compel the insured to surrender control of the litigation, and must, if necessary, secure independent counsel for the insured. (*O'Morrow* v. *Borad* (1946) 27 Cal.2d 794 [167 P.2d 483, 163 A.L.R. 894]; *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638 [39 Cal.Rptr. 731, 394 P.2d 571].) ■ And, as was explained in *Previews, Inc.* v. *California Union*

*Ins. Co.* (9th Cir. 1981) 640 F.2d 1026, 1028, the insurer's obligation [to defend, after the appearance of a conflict] "extends to paying the reasonable value of the legal services and costs performed by independent counsel selected by the insured." (Accord, *Executive Aviation, Inc.* v. *National Ins. Underwriters* (1971) 16 Cal.App.3d 799, 809-810 [94 Cal.Rptr. 347].)

The conflict situation was also thoroughly discussed in *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136 [65 Cal.Rptr. 406, 28 A.L.R.3d 368], placing a duty squarely on the attorney for the insurer to withdraw from representation or make full disclosure to both clients in the event of a conflict between them, or risk exposure to liability for harm resulting from his failure so to act, as well as to a charge of professional misconduct.

In the instant case, the record discloses that Purdy had in fact employed independent counsel as of December 1972, prior to the last offer of settlement; and that counsel strongly urged settlement of the Partin suit. Pacific, however, retained control of the litigation—to Purdy's disadvantage. The fact that Purdy did have independent counsel at a crucial stage of the settlement negotiations undoubtedly explains why the causes of action against the lawyer defendants herein were not refined to charges of failing to disclose a conflict between the insurer and insured.

Both Purdy and his trustee specified that the professional negligence of the lawyer defendants consisted of their failure to effectuate a settlement of the Partin litigation.

It is further alleged that this failure to effectuate settlement *caused* the damages of which the trustee and Purdy complain: the excess judgment, and Purdy's emotional distress occasioned by the judgment. We note that, as in other aspects of this litigation, the trustee has pursued the lawyer defendants for what was in essence damage to property interests while Purdy retained the right to seek redress for personal emotional distress.

With respect to the trustee's cause of action for compensatory damages, based upon the excess judgment award and the affirmation of that award on appeal, the difficulty presented is that of proximate causation, in that there is no discernible legal causation, an indispensable element in proving negligence against the lawyer defendants.

We are unaware of any authority which holds a lawyer legally responsible to a third party for *failing* to advise or persuade a client to take a particular course of action. A lawyer cannot properly compel a client to take his or her advice; a lawyer may strongly advise action by a client, action highly beneficial to the client or others, action clearly indicated by known facts, but there is no duty on the part of the client to follow

the lawyer's lead—that is not the nature of the relationship, assuming that the client is legally capable of acting on his own behalf. This reality is particularly evident in the case at bench where the lawyer defendants were advising a sophisticated business entity, an insurance company, but the reality is applicable in any lawyer-client relationship. At oral argument in this matter, it was suggested that the issue was not proximate causation, but foreseeability—that the question of whether the client would have followed the appropriate advice, if given, was a question of fact for the jury. We disagree, declining to introduce into the fray such collateral issues as the nature, and extent of trust and reliance existent or nonexistent in particular lawyer-client relationships. In our view, since a lawyer does not have the power to compel a client's acts, the lawyer cannot be held responsible to others for *failing* to advise the client to act in a particular manner, as improper and as damaging to others as that action may turn out to be. We note that in *Betts* v. *Allstate Ins. Co.* (1984) 154 Cal.App.3d 688 [201 Cal.Rptr. 528], a recent case upholding a damages award not only against an insurer but the insurer's attorneys, for bad faith failure to settle, the jury in *Betts* specifically rejected the notion that the excess judgment awarded against Betts *was* proximately caused by the lawyer defendants in that case. We, too, find no causal connection between the advice given or not given to Pacific by the Roberts group and the actual harm done. Put another way, the *intervening* cause was the right exercised by Pacific, in the face of good faith and fair dealing, to pursue the course of conduct they chose.

Concededly, the lawyer defendants did not order or even strongly urge Pacific to settle, perhaps because they knew such conduct would be fruitless. The correspondence between the lawyer defendants and Pacific indicates, however, that the lawyer defendants were aware of (1) the accumulating evidence of Purdy's responsibility for the accident and (2) the potential for an excess verdict, and communicated that awareness to Pacific. The practical problem was that Pacific, with a total exposure of only $100,000, apparently decided to gamble on a favorable outcome at trial, in disregard of what was most beneficial to their insured and the claimant.

 There were no allegations in the trustee's cause of action against the lawyer defendants of conspiracy or of the commission of any intentional torts. In the absence of such allegations or of failure to act properly with respect to disclosure of the conflict of interest, we hold as a matter of law that the cause of action by the trustee against the lawyer defendants was fatally defective due to failure to plead sufficient proximate cause.

That being so, we need not and do not decide whether *Goodley* v. *Wank & Wank, Inc.* (1976) 62 Cal.App.3d 389 [133 Cal.Rptr. 83] correctly de-

termined that a cause of action for legal malpractice may not be assigned in California.

Our discussion of the proximate causation problem precluding the trustee from recovery of economic damages applies equally to the recovery by Purdy of emotional distress damages. *Betts, supra,* squarely holds that an insurer's lawyers may be held responsible in a bad faith failure to settle situation for the emotional distress caused by their negligence, but it appears that *Betts* may be readily distinguished from the case at bench by the nature and quality of the attorneys' participation in the lack of good faith and fair dealing demonstrated by the insurer client, Allstate. In *Betts,* it was found that "The lawyers failed Betts by (1) lack of disclosure and sound advice; (2) after the excess verdict, when the conflict of interest was unmistakeable, actively working to protect Allstate and persisting in manipulating Betts against her own best interests; (3) assisting in manufacturing a false record against the time when a bad faith lawsuit might be instituted; (4) rather than advising consultation of independent counsel as possible or desirable, resisting the efforts of such counsel to become informed when finally retained; (5) discouraging Betts' assignment of rights in exchange for personal release and influencing her instead in the direction of bankruptcy." (*Betts, supra,* 154 Cal.App.3d, at p. 717.)

There were no similar allegations of misconduct on the part of the lawyer defendants in the case at bench; no breach of professional duty due to lack of disclosure was pleaded or proved; no *affirmative* conduct was alleged which caused Purdy's distress. The essence of the action was failure to "effectuate settlement," and for reasons already stated, this asserted omission does not have the requisite logical nexus to the harm suffered. We view our conclusion here as consistent with the discussion in *Betts* and the disposition in that matter. We affirm the trial court's determinations precluding plaintiffs from pursuing their causes of action against the lawyer defendants for professional negligence.

### PURDY'S ACTION AGAINST PACIFIC FOR EMOTIONAL DISTRESS AND PUNITIVE DAMAGES

Plaintiff Purdy has appealed from the trial court's grant of nonsuit to Pacific on the second cause of action alleged in the complaint, seeking redress for the personal emotional distress incurred by plaintiff due to Pacific's failure to settle the Partin lawsuit.

Purdy's cause of action for emotional distress did not pass to his trustee in bankruptcy as it was specifically exempted by section 70a (5) of the Bankruptcy Act, former 11 United States Code, section 110 (a)(5),

which provides that "rights of action . . . for injuries to the person of the bankrupt . . . shall not vest in the trustee unless by the law of the State such rights of action are subject to attachment, execution, garnishment, sequestration or other judicial process. . . ."

The rationale is clear; Congress did not intend that creditors would be made whole from funds paid to the bankrupt as compensation for personal suffering. (See e.g., *Ruebush* v. *Funk* (4th Cir. 1933) 63 F.2d 170, 173.)

 Under California law, the cause of action for failure to settle is assignable, but claims for emotional distress are not and did not pass to Purdy's trustee. (*Murphy* v. *Allstate Ins. Co., supra,* 17 Cal.3d 937, 945-946; *Reichert* v. *General Ins. Co.* (1968) 68 Cal.2d 822, 834 [69 Cal.Rptr. 321, 442 P.2d 377].)

Two Court of Appeal cases have considered the ramifications of the fact that the bad faith cause of action is a "hybrid" claim, encompassing both property rights and personal rights of the aggrieved party.

In *Purcell* v. *Colonial Ins. Co.* (1971) 20 Cal.App.3d 807 [97 Cal.Rptr. 874], the plaintiff assigned his cause of action for failure to settle and brought a *separate* action for the personal damages. The *Purcell* court held that the cause of action could not be split in that fashion, subjecting the insurer to multiple suits.

*Purcell* was followed by *Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783 [121 Cal.Rptr. 200], where the insured and his assignee filed a joint action against the insurer, each claiming that portion of the total damages to which each was entitled. This procedure was approved by the *Cain* court, on the ground that the major reason for denying recovery, protection against multiple suits, was not present in the litigation; the judgment awarding damages to the insured and the assignee, was upheld.

In the instant case, the trial court nonsuited Purdy because (1) there was no express reservation in the bankruptcy petition of his personal cause of action and (2) the cause of action was barred by the applicable statute of limitations. Neither ground was correct.

 We hold that where a bankrupt lists a hybrid cause of action for wrongful failure to settle, only the economic property cause of action is transferred to the trustee pursuant to section 70a of the Bankruptcy Act. That section provides for exemption of personal causes of action and a bankrupt need not expressly reserve such causes of action to himself. To allow recovery against an insurer under such circumstances to turn on

whether a bankruptcy petition contained a few magical words exalts form over substance.

Neither *Purcell* nor *Cain* dealt with a transfer of rights pursuant to a bankruptcy petition; the assignments made in those cases were voluntary. The emphasis in the *Cain* decision was placed on the unitary aspect of the litigation—jointly pursued by the insured and the assignee—as protecting the insurer against multiple lawsuits while also protecting the rights of the party aggrieved by the insurer. The *Cain* rationale applies equally here. Purdy retained his cause of action for emotional distress damages by operation of law and filed a joint suit with his trustee. No further action was required of him.

■ We further conclude that the trial court erroneously applied the wrong statute of limitations to the cause and in selecting the wrong accrual point for Purdy's cause of action.

As is explained in *Richardson* v. *Allstate Ins. Co.* (1981) 117 Cal.App.3d 8 [172 Cal.Rptr. 423], emotional distress damages occasioned by bad faith failure to settle are an integral part of the underlying cause of action, the breach of covenant of good faith and fair dealing, rather than a separate cause. This being so, the appropriate cause of action is determined by the nature of the underlying cause of action—in this case, Code of Civil Procedure section 339, subdivision 1, providing a two-year statute for injury to property rights. ■ In any event, as *Nationwide Ins. Co.* v. *Superior Court, supra,* 128 Cal.App.3d 711 teaches, an insured's cause of action for wrongful failure to settle does not fully mature until an appeal taken on the judgment in the initial action becomes *final.* If such a cause is considered "premature" when filed *before* an appeal is final, it is obviously incorrect to hold that a plaintiff such as Purdy, who filed within a year after the Partin judgment was filed, was too late.

Accordingly, we reverse the nonsuit granted Pacific on the second cause of action, and remand for further proceedings to establish Purdy's *damages* for emotional distress, if any, and to determine if exemplary (punitive) damages, if any, should be awarded. In all other respects, the judgment is affirmed.

Lillie, Acting P. J., and Dalsimer, J., concurred.

A petition for a rehearing was denied July 10, 1984.