Filed 6/4/14  Pacific Coast Build. Products v. Camellia Valley Supply CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PACIFIC COAST BUILDING PRODUCTS, | C068584 |
| Plaintiff and Respondent, | (Super. Ct. No. 34200900037123CU) |
| v. | |
| CAMELLIA VALLEY SUPPLY, INC., et al., | |
| Defendants and Appellants. | |

In 1981, Pacific Coast Building Products, Inc. (Pacific Coast) purchased all of the assets of Camellia Valley Supply, Inc.'s business, including underground pipe manufactured and sold by Camellia Valley Supply, Inc., as well as the exclusive right to the Camellia Valley Supply name.  The sale was memorialized in a written Agreement for Sale of Personal Property (the Agreement).

Twenty-five years later, Pacific Coast was sued in nine separate lawsuits alleging personal injury, wrongful death, and other claims resulting from exposure to asbestos-

1

containing pipes sold, distributed, or provided by Camellia Valley Supply (the Underlying Actions). By that time, Camellia Valley Supply, Inc. had long since dissolved as a corporation and, therefore, Pacific Coast tendered its defense to and requested indemnification from The Hanover Insurance Company (Hanover), the entity identified in the Agreement as Camellia Valley Supply, Inc.'s insurance carrier. When Hanover rejected the tender, Pacific Coast filed a complaint (the Complaint) against Hanover, as well as Camellia Valley Supply, Inc., and its successor, CV Supply, Inc., also a dissolved corporation (collectively, Camellia Valley or the Camellia Valley defendants) to enforce the defense and indemnity provisions in the Agreement. After the Complaint was filed, Pacific Coast was named in two additional lawsuits (the Pending Actions). Pacific Coast tendered those new actions to Hanover as well, but received no response.

In the meantime, Hanover successfully demurred to the Complaint. Instead of amending its complaint, Pacific Coast dismissed Hanover without prejudice and proceeded against Camellia Valley by way of a first amended complaint (First Amended Complaint). Following a one-day bench trial, the court found in favor of Pacific Coast and entered judgment against Camellia Valley in the amount of $829,202.57 for defense and indemnity costs related to the Underlying and Pending Actions.

Camellia Valley appeals. For the reasons that follow, we will dismiss the appeal.

FACTS AND PROCEEDINGS

Camellia Valley Supply, Inc. filed its articles of incorporation on April 2, 1974. According to those articles, Camellia Valley's purpose was "[p]rimarily to engage in the specific business of supplying all types of pipe to contracting firms," and "[t]o engage generally in the wholesale and retail sale and business of purchasing and re-selling water pipe, sewer pipe, drain pipe, and all related supplies and to construct, alter, repair, move, all types of pipe, both cast-iron, plastic and/or terra cotta to be used for the construction

2

of underground systems, for subdivisions, and buildings of all types including the manufacture thereof."

On October 1, 1981, Camellia Valley sold its assets and all rights to the trade name "Camellia Valley Supply" to Pacific Coast pursuant to the terms and conditions of the Agreement. David Lucchetti, President and CEO of Pacific Coast, negotiated and signed the Agreement on behalf of Pacific Coast. Directors Charles Vincent (deceased at the time of trial) and Tom Spinella (also believed to be deceased at the time of trial) signed on behalf of Camellia Valley.

Paragraph 10 of the Agreement was entitled "Indemnity." Subparagraph 10.1 stated as follows: "Seller shall indemnify, defend and hold harmless Buyer and the properties to be acquired from Seller hereunder from all taxes, liability, suits, claims, demands, damages, fees, costs and expenses (including reasonable attorneys' fees) arising out of or in connection with any debts, liabilities, including contingent liabilities, or obligations of Seller or Seller's practice, policies, conduct of the Seller's business, or ownership of the property being purchased hereunder prior to the Closing Date, other than those liabilities and obligations which Buyer expressly agrees to assume pursuant to the terms and provisions of this Agreement."

The Agreement also reflected, in paragraph 8(e), that Camellia Valley maintained, and would continue to maintain until October 1, 1981, business, product liability, and public liability insurance covering its business, its properties and its operations, the limits of which were set forth in Exhibit H to the Agreement. Exhibit H, entitled "List of Insurance," detailed the companies, policy numbers, and types and amounts of coverage associated with the insurance referenced in paragraph 8(e) of the Agreement. Of the 11 policies identified in Exhibit H, 10 were provided by Hanover.

According to Lucchetti, following the acquisition from Camellia Valley, Pacific Coast continued to operate Camellia Valley Supply at its existing Sacramento location, and continued "for some period of time" to sell the same products previously sold by

3

Camellia Valley Supply, Inc.  In particular, for a period of approximately six months after October 1, 1981, Pacific Coast sold or distributed the type of asbestos-containing underground pipe previously manufactured by Camellia Valley.  Thereafter, Pacific Coast "made the decision to exit that business."

In the meantime, in October 1981, Vincent and Camellia Valley's secretary, Lloyd Broughton, dissolved Camellia Valley Supply, Inc. and amended its articles, changing the name of the corporate entity to CV Supply, Inc.

In December 1986, CV Supply, Inc. directors Vincent, Spinella, and Dan Irwin dissolved CV Supply, Inc.

In 2005, Pacific Coast sold off all remaining assets of Camellia Valley Supply.

Between 2004 and 2010, the Underlying Actions (*McGill, Temple, Risse, Bowman, Dighton, Fuller, Kelley, Olson,* and *Haberthur*) and Pending Actions (*Santiago* and *Teale*) were filed.

On March 6, 2008, Pacific Coast sent a letter to Hanover tendering the defense and indemnification of the *Bowman, Kelley, Dighton, Olson, Temple,* and *McGill* actions.

On March 20, 2008, Hanover responded to Pacific Coast's letter stating that, after a diligent search of its records, it was unable to locate any evidence Hanover ever insured Camellia Valley.  Hanover requested complete policy information and the actual policies issued by Hanover, as well as complete copies of the pleadings from the personal injury lawsuits, without which Hanover advised it would be "unable to participate in the defense and/or indemnity of the [personal injury] cases."

On June 18, 2008, Hanover sent another letter to Pacific Coast reiterating that, after a diligent search of its records, it was unable to locate "any records or documents identifying Camellia Valley Supply as a named insured on a Hanover policy."  Hanover declined Pacific Coast's request to defend and indemnify the Underlying Actions.

On June 25, 2008, Pacific Coast sent a second letter to Hanover demanding that Hanover "participate in the resolution of [the Underlying Actions]."

4

On July 10, 2008, Pacific Coast sent a third letter to Hanover renewing its demand for defense and indemnification of the Underlying Actions.

On March 11, 2009, Pacific Coast filed its Complaint for declaratory relief, total equitable indemnity, comparative indemnity and contribution, express contractual indemnity, and breach of contract, against Hanover and the Camellia Valley defendants.

On May 12, 2009, the Hanover defendants filed a demurrer to the Complaint. Pacific Coast opposed the demurrer. In a footnote to their points and authorities in support of the demurrer, Hanover stated: "Hanover disputes that it ever issued any liability insurance policies to Camellia Valley."

On July 6, 2009, the trial court issued an order sustaining Hanover's demurrer with leave to amend as to the first, second, and third causes of action, and without leave to amend as to the fourth cause of action.

On July 31, 2009, Pacific Coast dismissed Hanover without prejudice and proceeded against the Camellia Valley defendants.

On August 6, 2009, Camellia Valley, then represented by Eugene C. Blackard, Jr., and Sean D. White of Archer Norris, A Professional Law Corporation, filed an Answer to the Complaint, denying the allegations and asserting affirmative defenses.

On August 13, 2010, after nearly a year of discovery, Pacific Coast filed a First Amended Complaint against Camellia Valley for declaratory relief, total equitable indemnity, comparative indemnity and contribution, express contractual indemnity, and breach of contract. Camellia Valley denied the allegations in the First Amended Complaint and asserted various affirmative defenses.

On October 29, 2010, Pacific Coast sent a letter to Hanover tendering the defense of the two Pending Actions, *Santiago* and *Teale*. Hanover did not respond.

A one-day court trial commenced on November 8, 2010. On April 29, 2011, the trial court entered its judgment after court trial (Judgment) in favor of Pacific Coast and

against Camellia Valley Supply, Inc. and CV Supply, Inc., jointly and severally, in the amount of $829,202.57 plus costs of suit and interest. This appeal followed.

DISCUSSION

We find that we cannot reach and resolve the merits of the issues raised on this appeal because we find that Camellia Valley Supply, Inc. and CV Supply, Inc., both dissolved California corporations, are not represented by counsel properly retained on this appeal.

During the course of the one-day court trial conducted on November 8, 2010, the following colloquy occurred between the court and Sean D. White of Archer Norris, counsel appearing for Camellia Valley:

"THE COURT: Now, Mr. White, how did you get in this case? Who is your client?

"MR. WHITE: I was retained by Hanover Insurance Company, your honor.

"THE COURT: So you're here more or less on behalf of Hanover then. There's nobody here that's on behalf of CV Supply, Inc. or --

"MR. WHITE: Well, I -- that's who I represent and I am here on behalf of them. I'm being paid by Hanover.

"THE COURT: Okay. Well, I kind of need to get this clear in my head --

"MR. WHITE: Mm-hmm.

"THE COURT: -- because Hanover -- I mean, Hanover has said, [w]e can't find the insurance policies. We don't think we ever insured you.

"MR. WHITE: That's correct.

"THE COURT: But you're here just in case.

"MR. WHITE: I'm here just in case, to prevent a default judgment from being entered.

6

"THE COURT:      Okay. But are you here then on behalf of CV Supply, Inc.? Are you here on behalf of the individual named sellers of the organization or their deceased -- or their estates?

"MR. WHITE:      I am here on behalf of the two companies, corporations; Camellia Valley Supply, Inc. and CV Supply, Inc.

"THE COURT:      So do you even have standing to raise that issue as to --

"MR. WHITE:      I believe I do, your Honor. They are my clients. I am representing those entities. Even though those entities are not paying my fees, that is who I am representing in this lawsuit."

Based on continued assertions by Hanover throughout this litigation that Hanover never entered into any contracts of insurance with Camellia Valley, based further on counsel's statements at trial that counsel was being paid by Hanover, and based on the apparent fact that the corporations had been dissolved and their principals were deceased, on November 27, 2013, this court ordered supplemental briefing as follows:

"Given the fact that, on this record, there is no evidence of any insurance policies issued by Hanover to defendants/respondents Camellia Valley Supply, Inc. and/or CV Supply, Inc., and the fact that Hanover denied issuing such policies, what authority did ARCHER NORRIS, A Professional Law Corporation have to appear and defend this lawsuit on behalf of Camellia Valley Supply, Inc. and/or CV Supply, Inc.?

"Is there any evidence on this record, that either Camellia Valley Supply, Inc. and/or CV Supply, Inc., through their officers or principals, requested Hanover to defend and/or indemnify them in this action?

"Is there any evidence on this record, that either Camellia Valley Supply, Inc. and/or CV Supply, Inc., through their officers or principals, retained ARCHER NORRIS, A Professional Law Corporation to appear and defend on behalf of Camellia Valley Supply, Inc. and/or CV Supply, Inc.?

7

"Given the fact that, on this record, there is no evidence of any insurance policies issued by Hanover to Camellia Valley Supply, Inc. and/or CV Supply, Inc., and the fact that Hanover denied issuing such policies, what authority does Greve, Clifford, Wengel & Paras, LLP have to appear and prosecute this appeal on behalf of Camellia Valley Supply, Inc. and/or CV Supply, Inc.?

"Is there any evidence on this record, that either Camellia Valley Supply, Inc. and/or CV Supply, Inc., through their officers or principals, retained Greve, Clifford, Wengel & Paras, LLP to appear on their behalf or prosecute this appeal?

"Given the apparent absence of any contracts of insurance between Camellia Valley Supply, Inc. and/or CV Supply, Inc. and Hanover, and in the absence of other authority for the appearance of Greve, Clifford, Wengel & Paras, LLP on this appeal, are Camellia Valley Supply, Inc. and/or CV Supply, Inc. without counsel on appeal?  If so, must the appeal be dismissed?"

On December 17 and 19, 2013, this court received the supplemental briefs. Pacific Coast, somewhat predictably, asserted that, in the absence of contracts of insurance between Camellia Valley and Hanover, Camellia Valley's attorney at trial had no authority to act on Camellia Valley's behalf nor do Camellia Valley's attorneys on appeal.

Greve, Clifford, Wengel & Paras, LLP (Greve, Clifford), the attorneys who purport to represent Camellia Valley on appeal, admits that Hanover, when it was a party to this action, denied issuing any policies to Camellia Valley based upon Camellia Valley's and Hanover's inability to locate any such policies.

Greve, Clifford admits further that there is no evidence in the record that Camellia Valley at any time requested Hanover to defend or indemnify them directly in this matter. The corporation has long been dissolved and its principals are deceased.  For the same reason, there is no evidence that Camellia Valley, through its officers or agents, retained Archer Norris to appear on their behalf and defend them at trial, nor is there evidence that

8

Camellia Valley, through its officers or agents, retained Greve, Clifford to represent Camellia Valley on appeal.

Greve, Clifford has brought to the court's attention that, in October 2012, Hanover brought a declaratory relief action in the United States District Court for the Eastern District of California asking, among other things, for the court to declare that, based upon Hanover's allegation that it did not issue any insurance policies to Camellia Valley, it has no duty to indemnify Camellia Valley for the Pacific Coast judgment.

Specifically, Hanover alleges at paragraph 10 of that declaratory relief complaint that:

"From March 2008 through the present, Pacific Coast has continuously maintained that Camellia Valley was the named insured on one or more liability policies issued by Hanover for the period of April 15, 1981 through April 15, 1982. However, Pacific Coast has never been able to produce either an original or a copy of any part of the alleged Hanover policies. Further, no one associated with Camellia Valley has ever been able to produce either an original or a copy of any part of the alleged Hanover policies. Last, despite a diligent search of available Hanover underwriting records, Hanover has never been able to locate either an original or a copy of any part of the alleged Hanover policies. Accordingly, it is Hanover's belief that Hanover did not issue any policy to Camellia Valley."

In paragraph 14 of that same complaint, Hanover "contends that (a) Hanover did not issue any insurance policy to Camellia, and (b) Hanover thus has no duty to indemnify Camellia Valley for any judgment in favor of Pacific Coast in the underlying lawsuit."

The question before us is whether Greve, Clifford has the authority to appear before this court as the attorneys for Camellia Valley.

Notwithstanding the consistent assertions in the trial court, in this court, and in the federal district court that Hanover did not at any time insure Camellia Valley and the

9

admission that neither Camellia Valley nor its principals at any time requested representation or agreed to representation by counsel retained by Hanover, Greve, Clifford argues that Hanover has a right to hire counsel to represent Camellia Valley since there is "some evidence" of insurance coverage by Hanover, that is, there is the representation in the contract of sale that Camellia Valley was insured by Hanover.

Greve, Clifford, in its supplemental brief, states that Hanover "made a decision to defend [Camellia Valley] against the claims filed by [Pacific Coast] to avoid a default judgment against [Camellia Valley]." Citing to the propositions that (1) "case law heavily favors the insured's rights when it comes to a defense and indemnity owed by a carrier to its insured" and "any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor," (2) "an insurer's duty to defend is broad, and requires a defense when there is merely only a potential for coverage," (3) "a commercial general liability policy, by its very nature, may potentially provide coverage to [Camellia Valley] for the claims made by [Pacific Coast] against [Camellia Valley]," and (4) "an insurance policy remains an asset of a dissolved corporation" and "the winding up of the affairs of a dissolved corporation continue *even beyond its dissolution*, and includes participating in litigation," Greve, Clifford concludes that "Hanover certainly cannot be faulted for assigning defense counsel to defend the interest of insureds until there is a judicial determination that there is no policy and no duty to defend and indemnify."

It therefore becomes apparent that Hanover hired counsel to defend Camellia Valley at trial and on appeal with the dual purpose of defending Camellia Valley and protecting Hanover's own interest in the event that proof of insurance later came to light. As noted by Mr. White at trial, Hanover had in fact retained his firm "just in case."

The flaw in Greve, Clifford's argument is the apparent assumption that an insurance company has the right to appear and speak *on behalf of and in the name of its insured* without a request from, or the agreement of, the insured and without the establishment of an attorney-client relationship between the attorneys and the insured.

10

An attorney's authority to speak and act on behalf of a client depends on the existence of an attorney-client relationship which in turn is one type of agency relationship. "It is elementary that the *relationship* between a client and his retained (or noncourt-appointed) counsel arises from a contract, whether written or oral, implied or expressed." (*Purdy v. Pacific Automobile Ins. Co.* (1984) 157 Cal.App.3d 59, 75; see also *Corcoran v. Arouh* (1994) 24 Cal.App.4th 310, 315-316.)

In this matter, based on the record as a whole including the statements of counsel at trial and the admission by counsel on appeal that there is no evidence that Camellia Valley requested Hanover to defend and indemnify it in this action, there is no evidence that Camellia Valley retained Archer Norris, A Professional Law Corporation to appear and defend on behalf of Camellia Valley at trial and, most importantly for our current purposes, there is no evidence that Camellia Valley retained Greve, Clifford to prosecute this appeal on their behalf, it is apparent that no contract for representation, written, oral, implied, or express, between Camellia Valley and the attorneys hired by Hanover ever came into existence. Necessarily then, neither Archer Norris at trial nor Greve, Clifford here, had or have the authority to speak on behalf of Camellia Valley in light of the fact that Camellia Valley never authorized them to do so.

As noted above, Greve, Clifford points out that Hanover should not be faulted for protecting Camellia Valley's interests until such time as the existence of insurance placed with Hanover is determined. With that we agree. We note that, while Hanover's interest in assigning counsel in this matter was in part to defend Camellia Valley, it was in equal part to defend its own interest against claims of failure to defend and, perhaps, indemnify, in the event insurance policies issued by Hanover to Camellia Valley later came to light. There is nothing wrong with that either. But Hanover ignored the correct procedural vehicle for defending Camellia Valley's interest and its own interest in this litigation.

Code of Civil Procedure section 387 (unless otherwise stated, undesignated statutory references that follow are to the Code of Civil Procedure) provides in relevant

11

part as follows: "Upon timely application, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene in the action or proceeding. An intervention takes place when a third person is permitted to become a party to an action or proceeding between other persons, either by joining the plaintiff in claiming what is sought by the complaint, or by uniting with the defendant in resisting the claims of the plaintiff, or by demanding anything adversely to both the plaintiff and the defendant. . . ."

We note at this point that we are not required here to determine whether Hanover would or would not have been successful had it sought to intervene in the trial court under section 387. That is, even if we were to conclude (which we do not) that under the circumstances here present Hanover would *not* have been permitted to intervene had it sought to do so in the trial court, that procedural dilemma would not have changed the law applicable to the formation of the attorney client relationship. In any event, we think that it is reasonably probable that a complaint in intervention filed by Hanover would have been allowed by the trial court. We make the following observations.

In *Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383, the Sixth District Court of Appeal held that, where a corporate defendant's corporate status had been suspended, Reliance, as the corporation's insurer, had the right to intervene and assert the corporation's defenses and set-offs given Reliance's direct and immediate interest in the litigation arising from Reliance's obligation to satisfy a default judgment entered against the corporation. The court observed that, ". . . if Reliance does not intervene in the instant case and raise defenses to the [plaintiff's] claims, the [plaintiffs] will be able to obtain an unopposed default judgment. The [plaintiffs] will then be able to bring a direct action against Reliance for payment of the default judgment to which Reliance is bound because it did not intervene. This result would have the effect of punishing Reliance for something it did not do, since '[i]nsurers have no control over the solvency or corporate viability of their insureds.' [Citation omitted.]" (*Id.* at p. 388; see

12

*Gray v. Begley* (2010) 182 Cal.App.4th 1509; *Executive Risk Indemnity, Inc. v. Jones* (2009) 171 Cal.App.4th 319, 333; *Royal Indemnity Co. v. United Enterprises, Inc.* (2008) 162 Cal.App.4th 194, 206; *Jade K. v. Viguri* (1989) 210 Cal.App.3d 1459.)

We are further informed in this matter by this court's holding in *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2006) 136 Cal.App.4th 212 (*Kaufman & Broad II*).

In *Kaufman & Broad II*, Kaufman & Broad was a defendant in a construction defect case brought by the owners of homes built by Kaufman & Broad. The latter brought a cross-complaint for indemnification against Performance Plastering, Inc., however, the California Franchise Tax Board had earlier suspended Performance Plastering's corporate status for its failure to pay its taxes.

CalFarm Insurance Company insured Performance Plastering and hired counsel to represent Performance Plastering on the cross-complaint. Counsel, Read & Alioti (Read) filed an answer to the cross complaint in the name of "Performance Plastering, Inc., a suspended corporation, by and through its general liability insurance carrier, CalFarm Insurance Company." (*Kaufman & Broad II*, *supra*, 136 Cal.App.4th at p. 216.) During the course of the litigation, Read discovered that the contract between Kaufman & Broad and Performance Plastering had been cancelled prior to any work being done by Performance Plastering on the home development project. Thereupon, Kaufman & Broad dismissed its cross-complaint against Performance Plastering.

Thereafter, CalFarm filed a motion for attorney fees against Kaufman & Broad and the latter opposed the motion on the basis that CalFarm, not having intervened in the action, was not a party to the litigation and Performance Plastering, as a suspended corporation, was not entitled to recover fees and costs based on its status as a suspended corporation. The trial court agreed and denied the motion for fees and costs.

This court affirmed the trial court ruling, holding that "when an insurance company seeks to provide a defense in pending litigation for a corporation that has been

13

suspended for nonpayment of its taxes, the insurance company must intervene in the action to protect its own interests and those of its insured. *The insurance company may not answer and litigate the lawsuit in the name of the suspended corporation without intervening in the case*." (*Kaufman & Broad II, supra,*136 Cal.App.4th at p. 216; emphasis added.)

The logic of *Kaufman & Broad II* supports the result we reach here. Put in its simplest terms, on appeal, Greve, Clifford purports to speak on behalf of Camellia Valley where an attorney-client relationship between Camellia Valley and Greve, Clifford never came into existence. There is no contract for representation either written or oral, implied or express, between the two. Hanover cannot unilaterally affix counsel to a client who never requested or agreed to the representation, in order to protect Hanover's interest "just in case" insurance coverage is later found to exist. And Hanover cannot be heard on this appeal because Hanover, having, for whatever reason, failed to intervene, is not a party to this litigation.

Hanover offers three cases in support of its argument that Hanover would not have been allowed to intervene in the trial court and thus would have had no ability to protect itself from potential liability for the underlying claims.

In *Corridan v. Rose* (1955) 137 Cal.App.2d 524 (*Corridan*) a child was injured in a tractor accident where the tractor was at the time being driven by his uncle and was allegedly owned by the child's grandfather. The insurance carrier, Zurich General Accident and Liability Insurance Company (Zurich) had issued a policy of liability insurance to the grandfather which covered any employee driving the tractor.

When the child, through his father, brought a personal injury action against the uncle and grandfather, both of the latter claimed coverage under the Zurich policy. Zurich denied coverage to the uncle unless the uncle agreed to a reservation of rights on the grounds that, in Zurich's view, the uncle was not acting as the grandfather's employee at the time of the accident. The uncle refused to sign the reservation of rights and, as

14

noted, Zurich denied coverage. Zurich agreed to defend the grandfather if the grandfather executed an answer to the complaint alleging that the uncle, and not the grandfather, was the owner of the tractor. Understandably, the grandfather refused to agree to the answer as being contrary to the facts at which point Zurich withdrew from his defense on the grounds of collusion and lack of cooperation. Zurich was then permitted to intervene on its own behalf.

On appeal, the court held that the permission granted to Zurich to intervene was error because "an insurer who disclaims liability on his policy has no interest justifying intervention in the action against his insured" (*Corridan, supra,* at p. 529), the court noting that ' ' '[t]he "interest" mentioned in section 387 which entitles a person to intervene . . . must be "in the matter in litigation and of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment" [citation omitted]; it must be "direct and not inconsequential" [citation omitted].' " (*Corridan, supra,* at p. 530.)

In our view, the holding in *Corridan* and like cases would not, in and of itself, preclude a complaint in intervention filed by Hanover for the simple reason that, in this litigation, Hanover never formally denied coverage of Camellia Valley. Hanover litigated this matter on the basis that Camellia Valley *might* have coverage by Hanover in the event that the policies referred to in Exhibit H to the Agreement might later be found. Thus, Mr. White's agreement with the trial court's observation that, although he was being paid by Hanover, he was there representing Camellia Valley "just in case" and to "prevent a default judgment from being entered.

Hanover also cites *Kuperstein v. Superior Court* (1988) 204 Cal.App.3d 598 (*Kuperstein*). In *Kuperstein,* Mr. Kuperstein, doing business as Sports Arena Tropicals sold an aquarium to the Beaubiens and the aquarium started a fire. The Beaubeins sued. Although Allstate Insurance Company never insured Sports Arena Tropicals, Allstate did insure a business later owned by Kuperstein, Clairmont Tropical Fish. When the

15

Beaubeins sued Sports Arena Tropicals, Kuperstein tendered the defense to Allstate. Allstate investigated the claim, reserved its rights and moved to file a complaint in intervention seeking a declaration of rights and duties under the policy, including a declaration that it had no duty to defend Clairmont Tropical Fish. The trial court allowed the complaint in intervention.

On the subject of intervention, the court of appeal reversed. The court noted that permissive intervention looks to three factors to determine the propriety of intervention: (1) whether the intervenor has a direct interest in the litigation, (2) whether the intervenor will enlarge the issues raised by the original parties, and (3) whether the intervenor would tread on the rights of the original parties to conduct their lawsuit.

The court held that "Allstate does not have a direct interest such that it will gain or lose by the direct legal operation of the judgment. The direct legal effect here is on Kuperstein. If judgment is for the plaintiff, how Kuperstein pays this and whether he has insurance to cover it are collateral. There is no direct interest on the part of the insurer. [Citation omitted.] Permitting intervention in such circumstances necessarily expands the scope of the lawsuit to include issues necessary to determining coverage. In that the insured and the insurer seek different factual resolutions of certain issues, intervention necessarily injects the possibility the defendants will not be able to conduct the lawsuit on their own terms." (*Kuperstein, supra,* at pp. 600-601.)

*Kuperstein* does not aid Hanover in its contention that it would not have been able to intervene in this action in the trial court. Hanover did not seek to litigate coverage issues there, but only appeared to defend Camellia Valley, which litigation would have proceeded exactly as it did had Hanover been allowed to intervene.

Finally, Hanover cites *Blue Ridge Ins. Co. v Jacobsen* (2001) 25 Cal.4th 489 for the unremarkable proposition that an insurer may agree to defend under a reservation of rights; that this meets its obligation to furnish a defense without waiving its right to assert coverage defenses at a later time; and that the insurer can reserve its rights unilaterally

16

by simply giving notice to the insured.  We are puzzled by the citation to this holding unless Hanover thinks that it somehow bears on its claim that Camellia Valley "retained" counsel paid for by Hanover when Hanover sent a reservation of rights letter by certified mail to a person Hanover believed was one of Camellia Valley's remaining living principals and later received a signed return receipt in response to their letter, but nothing more.  While arguably this would have been a sufficient notice of a reservation of rights, we do not see how a signed return receipt can be enlarged to a contractual agreement for legal representation.  Even if one assumes that the person who signed for the letter was in fact a former principal of Camellia Valley, for all any of us know, he or she simply threw the letter away.

Thus, appellants Camellia Valley Supply, Inc. and CV Supply, Inc. are without legal counsel on this appeal.  " . . . [U]nder a long-standing common law rule of procedure, a corporation, unlike a natural person, cannot represent itself before courts of record in propria persona, nor can it represent itself through a corporate officer, director or other employee who is not an attorney.  It must be represented by licensed counsel in proceedings before courts of record.  [Citation omitted.]" (*CLD Construction, Inc. v. City of San Ramon* (120 Cal.App.4th 1141, 1145; *Paradise v. Nowlin* (1948) 86 Cal.App.2d 897, 898.)

Being without counsel, Camellia Valley Supply, Inc.'s and CV Supply, Inc.'s appeal must be dismissed.

17

DISPOSITION

The appeal is dismissed.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2), (5).)


                                                                                               HULL              , J.


We concur:


RAYE            , P. J.


MURRAY        , J.

18