Anna Rue **CAMP, et al., Plaintiffs,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY,**
Defendant.

No. 89–30035–RV.

United States District Court,
N.D. Florida,
Pensacola Division.

Feb. 12, 1991.

---

**880**

Robert G. Kerrigan, Pensacola, Fla., Adalberto Jordan, Talbot D'Alemberte, Miami, Fla., pro hac vice, for plaintiffs.

Elmo R. Hoffman, Orlando, Fla., Mark S. Marani, Gus H. Small, Jr., Atlanta, Ga., pro hac vice, J. Dixon Bridgers, III, Carlton, Fields, P.A., Pensacola, Fla., for defendant.

## ORDER GRANTING SUMMARY JUDGMENT

VINSON, District Judge.

Pending are cross-motions for summary judgment filed by defendant St. Paul Fire and Marine Insurance Company ("St. Paul") (doc. 105) and the plaintiffs, Anna Rue Camp and John E. Venn, as trustee of the estate of Fariss D. Kimbell, Jr., M.D., (doc. 90). For the reasons stated below, I GRANT defendant's motion and DENY the plaintiffs' motion.

This diversity case arises out of a medical malpractice action brought in state court by plaintiff Anna Rue Camp against Dr. Fariss D. Kimbell, Jr., the insured. Defendant St. Paul was Dr. Kimbell's liability insurance carrier. Pursuant to a jury's verdict, a judgment of over $3 million was entered in favor of Camp, but with specific conditions discussed below. The judgment is well in excess of St. Paul's $250,000 liability insurance policy limit. Prior to the entry of the judgment, but during the pendency of the malpractice litigation and approximately nine months before trial, Dr. Kimbell received a discharge in bankruptcy. The discharge specifically included the then-pending claim of Anna Rue Camp. St. Paul paid Camp the full $250,000, plus interest, of the policy limits following exhaustion of appeal in the state courts. This litigation involves the "excess" amount. Plaintiff John E. Venn is the trustee of Dr. Kimbell's bankruptcy estate. Venn and Camp have sued St. Paul under Florida law for bad faith failure to defend Kimbell's claim (which includes bad faith failure to settle).

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). "The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989),

*cert. denied sub nom., Spears v. Cornelius,* — U.S. —, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990).

However, summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Id.* An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538, 552 (1986).

On a summary judgment motion, the record and all inferences that can be drawn from it, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176, 177 (1962). Furthermore, the court must consider the entire record in the case, not just those pieces of evidence which have been singled out for attention by the parties. *See Clinkscales v. Chevron USA, Inc.,* 831 F.2d 1565, 1570 (11th Cir.1987).

## I. GENUINE ISSUE REGARDING THE UNDERLYING BAD FAITH CLAIM.

Preliminarily, both St. Paul and the plaintiffs argue, respectively, that there is no genuine issue of material fact regarding St. Paul's bad faith, and each of them maintain, therefore, that they are entitled to judgment as a matter of law. In summary, St. Paul argues that (1) it relied on the favorable reviews of consulting physicians Greer and Sullivan; (2) it offered several times to settle the case for amounts up to $150,000; (3) it sought and received two legal opinions regarding the effect of Kimbell's bankruptcy on its duty to attempt to settle; and (4) Kimbell said he did not want the matter settled.

Plaintiffs, on the other hand, point to evidence they believe establishes bad faith. Regarding the reasonableness of its settlement offers, plaintiff submits evidence that Camp's attorney had informed St. Paul that Camp's medical expenses *alone* were $130,000. The record suggests that St. Paul's attorney, at least at one point, was not optimistic about Kimbell's chance of success at trial and advised settlement at $200,000 to $225,000, figures much higher than St. Paul ever offered and very close to the policy limits, and it is undisputed that Camp's attorney offered to settle at the policy limits of $250,000.

Most convincing is St. Paul's argument that it relied on the advice of counsel that Kimbell's bankruptcy eliminated his personal exposure to judgment in excess of the insurance coverage on Mrs. Camp's claim, thus rendering harmless an excess judgment against him. However, given the amount of relevant evidence supporting each side, I cannot say that a rational factfinder must find for or against plaintiff in this instance. More importantly, there are many genuine issues of material fact concerning the underlying bad faith claim, precluding summary judgment for either plaintiffs or defendant.

The relevance of defendant's "good faith reliance" evidence also leads to the denial of plaintiffs' motion, filed in the alternative with its summary judgment motion, to exclude all evidence regarding Kimbell's bankruptcy. Plaintiffs argue that St. Paul has waived the use of any evidence of this nature because it would involve the testimony of attorney Elmo R. Hoffman, who gave the advice in question. Hoffman is presently representing St. Paul in this litigation. Plaintiffs point out that Hoffman cannot testify at trial on this issue and represent St. Paul at the same trial.

St. Paul responds that it does not need to, or intend to, call Hoffman as a witness at trial. Rather, it intends merely to have its employee witnesses identify Hoffman's letters to St. Paul, offer such letters in evidence, and testify as to the extent to which St. Paul relied on those opinions. Thus, if not offered for the truth of the opinion set out in the letters, it would not be necessary for Hoffman to testify. If this is all that trial necessitates, disqualifi-

cation of Mr. Hoffman will not be necessary. I find that there has been no waiver of the use of this evidence. In any event, the evidence is certainly competent and material to the pending Rule 56 motions, and plaintiffs' motion is DENIED.

## II. *CAMP'S STANDING.*

■ Venn and Camp have agreed that any recovery made against St. Paul will be payable to Kimbell's bankruptcy estate, and that Camp will only share in these funds as an unsecured creditor of Dr. Kimbell's bankruptcy estate. Thus, Camp does not have independent standing to sue St. Paul. The cause of action, if any, is Venn's alone, as trustee of the bankruptcy estate. Camp is hereby DISMISSED as a plaintiff in this case.

## III. *EFFECT OF INSURED'S BANK-RUPTCY ON INSURER'S LIABILITY.*

■ The unique and interesting issue in this case, however, is a legal one: whether Dr. Kimbell's discharge in bankruptcy prior to trial relieves St. Paul of any potential bad faith liability under the law of Florida. I conclude that it does, as discussed below.

(A) *Direct action bad faith claims.* Florida has long recognized a common law cause of action for bad faith claims for an insurance company's failure to settle (or defend) third-party actions within the policy limits, thereby exposing the insured to a judgment in excess of the insurance coverage. The cause of action was the insured's alone. An assignment of the bad faith claim from the insured to the third-party injured party/judgment creditor was a prerequisite to any action by the injured third-party against the insurance company. However, in *Thompson v. Commercial Union Ins. Co.,* 250 So.2d 259 (Fla.1971), the Supreme Court of Florida authorized the third-party to maintain a direct bad faith claim against an insurer. *Id.* at 264. *See also Boston Old Colony Ins. Co. v. Gutierrez,* 386 So.2d 783 (Fla.1980). In the absence of Dr. Kimbell's bankruptcy discharge, Camp would clearly have a bad faith cause of action.

However, St. Paul contends that the Supreme Court of Florida's decision in *Fidelity and Casualty Co. v. Cope,* 462 So.2d 459, 460–461 (Fla.1985), eliminates the plaintiff's legal cause of action under the facts of this case.

The issue in *Cope* was whether an injured third-party who has secured an excess judgment can maintain a bad faith claim against the insurer under *Thompson* when the injured party has executed a release of his claim against the tortfeasor. 462 So.2d at 459. The Court explicitly reaffirmed the *Thompson* principle that an injured third party may bring a bad faith clam directly against an insurer, but went on to say:

> Nowhere in *Thompson,* however, did we change the *basis or theory of recovery.* We did not extend the duty of good faith by an insurer to its insured to a duty of an insurer to a third party. The basis for an action remained the damages of an insured from the bad faith action of the insurer which caused its insured to suffer a judgment for damages above his policy limits. *Thompson* merely allowed the third party to bring such an action in his own name without an assignment.
> *Fidelity and Casualty Co. v. Cope, supra,* 462 So.2d at 460–461 (emphasis added).

■ Thus, it is well-settled that, in Florida, the insurance company owes no duty to an injured third party who has obtained a judgment against the company's insured. The third party's cause of action, if any, is "not separate and distinct from, but [is] derivative of," the insured's. *Id.* at 461. As a result, a satisfaction and/or release of the insured destroys the third party's derivative cause of action.

The Eleventh Circuit applied the principle of *Cope* in *Clement v. Prudential Property & Casualty Co.,* 790 F.2d 1545 (11th Cir.1986). There, the injured third party did not execute a release of the insured's liability, as in *Cope.* Instead, the third party settled the underlying litigation for $75,000, with the understanding that the insured would not personally be liable for any amount over $10,000, the policy limit.

In return, the insured agreed to prosecute a bad faith action against his insurer, assigning the benefits to the third party. *Id.* at 1546. The Eleventh Circuit held that *Cope* applied to bar the insured's resulting bad faith action. Since the insured was "released from liability for any damages he might have suffered as a result of the insurer's bad faith," the court reasoned, Florida law disallowed any bad faith claim absent prior assignment of that claim. *Id.* at 1548.

(B) *Effect of insured's bankruptcy.* Relying on *Clement*, St. Paul contends that *Cope* applies because Dr. Kimbell has been discharged in bankruptcy and cannot be personally liable for any damages in excess of the policy limits. Dr. Kimbell filed for bankruptcy on July 9, 1986. On April 13, 1987, the bankruptcy judge modified the automatic stay afforded under the Bankruptcy Code so as to allow Camp's state court malpractice action Dr. Kimbell to proceed. *See* attachments to doc. 2. The judge ordered that:

> any judgment entered in such action shall be for the full amount of the claim of Harvey and Anna Rue Camp and shall thereby liquidate such claim for purposes of this Chapter 7 case; *provided, however, that such judgment shall not be enforceable against the Debtor as a personal liability of the Debtor. Id.* (emphasis added).

Final judgment against Dr. Kimbell was entered in state court on June 25, 1987. The state circuit court judge referred to the April 13, 1987, bankruptcy order in the final judgment. Thereafter Dr. Kimbell moved for an order to cancel and discharge the judgment. On January 11, 1989, an order was entered in the state circuit court, ordering that: "... pursuant to Section 55.145, Florida Statutes, the judgment against Defendant Fariss D. Kimbell is hereby canceled and discharged." *See* doc. 106, Ex. A. Section 55.145 provides in pertinent part:

> If it appears ... that the bankrupt or debtor has been discharged ... the Court shall enter an order canceling and discharging said judgment. *The order of cancellation and discharge shall have the same effect as a satisfaction of judgment....*
>
> § 55.145, Fla.Stat. (1985) (emphasis added).

Subsequently, on December 15, 1988, the bankruptcy judge entered an order which acknowledged the state court judgment and allowed that judgment as a general, non-priority unsecured claim. *See* attachments to doc. 2. The court again ordered that "such judgment and such claim shall not be enforceable against Debtor." *Id.*

St. Paul's argument on this issue places special emphasis on Section 55.145, which states that a discharge in bankruptcy shall "have the same effect as a satisfaction of judgment." If the judgment has been "satisfied" as to the insured, St. Paul argues, then *Cope* applies and plaintiffs have no cause of action.

Plaintiffs counter that Kimbell's bankruptcy estate is still responsible for payment of creditors' claims, including Camp's excess judgment; therefore, the estate (represented by its trustee) may still recover from the insurer. They claim harm to the estate through the increased amount of claims against the estate, to the detriment of all creditors. According to the plaintiffs, the Florida statutory language providing for "the same effect as a satisfaction of the judgment" must refer only to the personal liability of the insured; that it was not intended to bar recovery from an insurer whenever the insured went bankrupt.

The answer to this argument, I believe, is that the insurer's duty of good faith runs to the insured alone, as the *Cope* opinion makes very clear. As the Supreme Court of Florida indicated, the bankruptcy estate's cause of action is entirely derivative of the insured's, and is extinguished once the insured is released from obligations stemming from the underlying judgment. The underlying judgment could not be more clear: Kimbell was never personally liable for the excess judgment. Under the law of Florida, his discharge in bankruptcy had the effect of "satisfying" that judgment with respect to him. Further, the

discharge was well before trial and long before judgment was entered. As the bankruptcy judge's order makes perfectly plain in the order of April 13, 1987, any judgment in the *Camp* litigation "shall not be enforceable against the Debtor as a personal liability." Therefore, Kimbell was, before trial, "released from liability for any damages he might have suffered as a result of the insurer's bad faith." *See Clement, supra,* 790 F.2d at 1548. As a result, *Cope* and *Clement* control, and St. Paul cannot be liable for any alleged bad faith in defending Dr. Kimbell.

The parties have cited no Florida authority addressing whether an insured's discharge in bankruptcy destroys his claim against an insurer, let alone the claim of a third party or bankruptcy trustee whose cause of action derives from the insured's. My research has indicated that this is a matter of first impression under Florida law. St. Paul cites *Harris v. Standard Accident and Ins. Co.,* 297 F.2d 627 (2d Cir.1961), *cert. denied,* 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962), which supports its view. The Second Circuit held that where an insured, who was insolvent before the excess judgment, paid no part of the judgment, and was discharged in bankruptcy, he suffered no damage; thus, the bankruptcy trustee could not maintain a bad faith action absent proof that the insurer *caused* the insured's bankruptcy. Other cases have reached this result as well. *See, e.g., Bourget v. Government Employees Ins. Co.,* 456 F.2d 282 (2d Cir. 1972). The facts of *Harris* are, of course, somewhat different from those of this case.

Plaintiffs cite a number of cases reaching a different conclusion. *See Torrez v. State Farm Mut. Auto Ins. Co.,* 705 F.2d 1192, 1198 n. 2 (10th Cir.1982), *supra, citing National Farmers Union Property & Casualty Co. v. O'Daniel, Administrator,* 329 F.2d 60 (9th Cir.1964); *Lee v. Nationwide Mut. Ins. Co.,* 286 F.2d 295 (4th Cir. 1961); *Maguire v. Allstate Ins. Co.,* 341 F.Supp. 866 (D.Del.1972); *Sweeten, Administrator v. National Mut. Ins. Co.,* 233 Md. 52, 194 A.2d 817 (1963); *Wolfberg, Administrator v. Prudence Mut. Casualty Co.,* 98 Ill.App.2d 190, 240 N.E.2d 176 (1968). *See also Purdy v. Pacific Automobile Ins. Co.,* 157 Cal.App.3d 59, 203 Cal. Rptr. 524 (2d Dist.1984); *Carter v. Pioneer Mut. Casualty Co.,* 67 Ohio St.2d 146, 423 N.E.2d 188, 191–192 (1981).

I do not find these cases to be persuasive, however, for at least three reasons. First, there are significant differences between a decedent's estate, involved in all of these cases except *Purdy,* and an estate in bankruptcy. A decedent's estate is (excluding suicide) involuntary and has no conditions precedent. The decedent is not seeking an economic rebirth. Assets and liabilities of the decedent discovered, or arising, after death are unquestionably the assets and liabilities of the decedent's estate. Therefore, if an insured has no assets so that he is essentially judgment-proof during his lifetime, there is no reason to treat his estate differently after his death. A cause of action for bad faith should be recognized, regardless of whether it arose before or after death. The personal representative of the estate should be able to pursue the claim.

On the other hand, an estate in bankruptcy serves a very limited statutory function. Strict conditions precedent apply to a debtor's discharge. Usually, the bankruptcy is voluntary (as was Dr. Kimbell's). The debtor clearly intends to live a new, post-bankruptcy, economic existence. Neither the filing nor the discharge can be the equivalent of death. Post-discharge income, assets and liabilities of the debtor are ordinarily unaffected by the bankruptcy. Under Florida law, a bad faith claim is personal to the insured. Thus, if a cause of action for bad faith arises after discharge, it must belong (assuming, of course, that a cause of action can arise under such circumstances) to the insured and cannot be claimed as an asset by the bankruptcy trustee. The cause of action for bad faith does not follow the discharged claim, nor can it logically be split or divided between the debtor and the trustee. Therefore, the rationale of the decedent's estate cases does not necessarily apply to an estate in bankruptcy.

Second, these cases cited by plaintiff are not dealing with the specific law of Florida. Under *Cope*, a satisfaction or release of the insured destroys the third party's derivative cause of action for bad faith. Section 55.145 provides that an order of cancellation and discharge shall "have the same effect as a satisfaction of the judgment." That is the status of the *Camp* judgment.

Third, the specific language of the bankruptcy judge's order relieved Dr. Kimbell of any potential liability for an excess judgment before any judgment was entered. No judgment liability or judgment lien ever arose or attached to Dr. Kimbell with regard to the excess. Under *Cope* and *Clement*, no cause of action can arise under such circumstances.

The plaintiffs further argue that the language of Kimbell's insurance policy preclude a finding that his discharge in bankruptcy immunizes St. Paul of bad faith liability. They analogize to the Tenth Circuit's decision in *Torrez, supra,* and the District Court of Delaware's opinion in *Maguire, supra,* wherein the policy's terms provided that "insolvency" or "bankruptcy" of the insured did not relieve the insurer of its obligations. The wording in the two policy clauses involved in those cases was almost identical to the corresponding clause in Kimbell's policy.[1] These decisions point out that since two of the insurer's obligations under the policy were to defend and/or settle, the clause constituted a waiver by the insurer of any insolvency defense.

Although I do not agree with the *Torrez* and *Maguire* interpretation of Kimbell's policy language, it is not necessary to construe that language under the facts of this case. The clause does not affect the application of the law of Florida and the particular way the judgment was entered in accordance with that law. Moreover, I believe that the clause in question more plausibly refers only to St. Paul's duty to defend Kimbell and to pay off its claim up to the policy limits, a duty clearly contemplated by the parties, regardless of Kimbell's bankruptcy or insolvency. It seems unnecessary to extend the reach of this clause to St. Paul's duty of good faith regarding settlement because the bankruptcy judge's orders and Camp's judgment itself make it clear that any such duty was extinguished upon the insured's discharge in bankruptcy. Kimbell's discharge, well before the judgment was entered, eliminated a critical element in any cause of action for bad faith: the potential exposure of Kimbell personally to a judgment in excess of the policy limits.

Finally, the plaintiffs argue that the result urged by St. Paul is unattractive on policy and common-sense grounds. As the former Fifth Circuit's (later Chief) Judge Brown noted, in agreement with allowing the bankruptcy estate to pursue the claim and finding no Georgia law on the issue:

> Any other result would be to allow an insurer to default, *drive its assured to the wall of bankruptcy,* and then blithely advise the estate, the trustee, the assured and all of the creditors that while its duty was breached, there is nothing to be done about it.
>
> *Palmer v. Travelers Ins. Co.,* 319 F.2d 296, 300 (5th Cir.1963) (Brown, J., concurring) (emphasis added).

This reasoning is only convincing when applied to the case where the insurer's bad faith leads to an excess judgment which *causes* the insured to go into bankruptcy (which is how Judge Brown applied it). Since bankruptcy itself is an injury,[2] the

---

1. In Dr. Kimbell's policy, St. Paul promises: "If the protected person or his or her estate goes bankrupt or becomes insolvent, we'll still be obligated under this policy." Doc. 141, Ex. 28, at 8.

The policy language in *Maguire* read: "Bankruptcy or insolvency of the insured or of the insured or his estate shall not relieve the Allstate of any of its obligations." *Maguire,* 341 F.Supp. at 869.

The corresponding clause in *Torrez* read: "Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the company of any of its obligations hereunder." *Torrez,* 705 F.2d at 1196.

2. *See, e.g., Smoot v. State Farm Mut. Auto Ins. Co.,* 299 F.2d 525 (5th Cir.1962). Ruling that payment of the judgment by the insured was not a prerequisite to a bad faith suit, the Fifth Circuit further suggested the bankruptcy of the

insurer's breach of its duty in this case has caused its insured's bankruptcy, for which the insured may be compensated. *See Harris v. Standard Accident & Ins. Co.,* 297 F.2d 627, 632 (2d Cir.1961), *cert. denied,* 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); *Young v. American Casualty Co.,* 416 F.2d 906, 911–912 (2d Cir.1969), *cert. dismissed, Myles v. Procunier,* 396 U.S. 997, 90 S.Ct. 580, 24 L.Ed.2d 490 (1970); *see also Larrabaru Bros., Inc. v. Royal Indemnity Co.,* 604 F.2d 1208, 1210, 1215 (9th Cir.1979) (California law); *Anderson v. St. Paul Mercury Indemnity Co.,* 340 F.2d 406, 409 (7th Cir.1965) (Indiana law). The plaintiffs adopt this theory when they argue, alternatively, that St. Paul's bad faith caused Kimbell's bankruptcy. I now turn to this issue.

(C) *Whether St. Paul's Bad Faith Caused Dr. Kimbell's Bankruptcy.* After an exhaustive review, I find that the record shows that there is no genuine issue of fact on this question, and that St. Paul's alleged bad faith was *not* the cause of Kimbell's bankruptcy.[3] Plaintiffs point to a June 10, 1985, letter from Mr. Westmoreland, Kimbell's bankruptcy attorney, to Mr. Bozeman, St. Paul's counsel, in which Westmoreland states that Kimbell's potential excess exposure was "a factor" in the decision to file for bankruptcy. Doc. 141, Ex. 18.

Naturally, the best source must be Dr. Kimbell himself. His affidavit (doc. 145) states that the Camp suit precipitated Baptist Hospital's summary suspension of his staff privileges, which reduced his referrals. (His privileges were eventually restored in November 1985, after he had taken refresher training.)[4] The reduction in referrals, in turn, substantially decreased

his income and earning capacity, forcing him to "consider" bankruptcy. *Id.,* ¶¶ 8–10.

In his deposition, which is a more reliable and complete item of evidence, Kimbell makes it apparent that *several* major factors were at work, including the *two* malpractice suits then pending against him. More pressing and of concern to Dr. Kimbell were his obligations under several failed marriages, his large preexisting debts, and his abrupt loss of income. *See* Kimbell dep. at 89. He further states that he left the decision to file bankruptcy up to Westmoreland, his attorney, and never explicitly instructed Westmoreland to file. *Id.* at 80. Kimbell was unable to pinpoint any period as the time he decided to file, saying instead that "as each month came into play [after February 1985, when his income precipitously dropped] ... it was obvious to me that I could not pay my debts and that I would have to go bankrupt under the circumstances." *Id.* at 90.

Although Kimbell does not explicitly attribute his bankruptcy to a single cause in his deposition, his detailed description of the dire financial conditions with which he was struggling long before the Camp suit was filed show that there is no "but for" causation in this case. Kimbell testified that before 1985, he was "deep in debt" with "a lot of obligations." *Id.* at 34. He was living from month to month with no savings. *Id.* at 59. However, he was able to meet his obligations as long as his income continued. *Id.* at 34.

In February 1985, his income drastically dropped, from a monthly average of roughly $17,000 to a February income of $2000. As a result, he became unable to carry his

---

insured would not extinguish his right of action, either, assuming causation by the insured:

> There are further acute factors which demonstrate that taking bankruptcy itself is a damage, e.g. cost, attorney fees, surrender of much property otherwise exempt from local execution, and the like.
> *Id.* at 530 n. 11.

**3.** Initially, I note that there is no claim that Dr. Kimbell fraudulently entered into bankruptcy, either in collusion with St. Paul or otherwise, to somehow escape liability. Thus, plaintiffs have

waived use of the provision for revocation of discharge obtained by fraud. *See* 11 U.S.C. § 1328.

**4.** *See id.* at 63. I note that Kimbell's privileges at Sacred Heart Hospital were *not* suspended. Kimbell stated, nonetheless, that there was substantial overlap between the doctors practicing at both hospitals and the area generally; once his suspension at Baptist became known, referrals came few and far between.

notes. His income improved only marginally after that, and then dropped to virtually nothing. *Id.* at 44, 65. Kimbell testified that this was the beginning of the financial difficulties that led to his bankruptcy. *Id.* at 59, 89. Moreover, he began seriously considering bankruptcy at this time. *Id.* at 59.

Kimbell also testified that there was approximately a six-month lag between the performance of his services and his payment for them through the various health insurers. *Id.* at 46. If true, calculating backward from February 1985, his practice difficulties must have started as early as August of 1984, five months before the Camp lawsuit was filed in December of 1984.

After Baptist Hospital suspended his privileges, Dr. Kimbell continued to suffer from a sharply reduced income. He consulted attorney Westmoreland about filing for bankruptcy in April or May of 1985; they decided first to try to sell his Pensacola properties to pay some of his debts and thereby avoid bankruptcy. *Id.* at 61. He stopped practicing in May, he closed his office in June, and went unemployed for over three months. *Id.* at 61–62.

In October 1985, he went to work as an associate neurosurgeon in Fort Lauderdale for approximately $70,000 a year—roughly $6,000 per month. *Id.* at 65. At this time, Kimbell was still hopeful he could avoid bankruptcy. *Id.* at 78. After deciding in early July 1986 that his employer had secretly hired him as merely temporary help, he filed his bankruptcy petition on July 11 and officially resigned his position on July 25. *Id.* at 76. At all times, he employed his own private, independent counsel regarding the bankruptcy decision. There is absolutely nothing in the record to indicate that St. Paul aided or actively encouraged his bankruptcy filing.

This chronology demonstrates that Kimbell would have gone bankrupt, independent of any bad faith on the part of St. Paul. The record reflects that his liabilities well exceeded his assets, without any consideration of the Camp suit. The practice difficulties leading to Kimbell's drastic de-

crease in income apparently started before Camp filed suit. This independent income reduction, by itself, rendered Kimbell unable to meet his obligations and forced him to start liquidating whatever he could sell before he finally filed in July 1986.

Further, Baptist Hospital's suspension of privileges occurred several weeks after Camp filed suit. Even if St. Paul acted in the best of good faith, it is not reasonable to expect that it would have settled at the policy limits so quickly. Thus, with or without such a settlement, Kimbell would have lost his privileges, and with it, his referrals. Plaintiffs have submitted no evidence showing that a later settlement by St. Paul would have triggered the restoration of his Baptist privileges earlier than November 1985, when they were actually restored, and it would be sheer speculation to infer that a settlement would have done so. Therefore, I conclude that no reasonable factfinder could find that any alleged bad faith by St. Paul was a factual, let alone a proximate, cause of Kimbell's bankruptcy.

## IV. *CONCLUSION.*

For the foregoing reasons, I find that St. Paul is entitled to judgment as a matter of law. St. Paul's motion for summary judgment is GRANTED, and plaintiffs' is DENIED. All other pending motions are DENIED, as moot.

DONE AND ORDERED.