**Anna Rue CAMP and John E. Venn, as Trustee of the Estate of Fariss D. Kimbell, Jr., M.D., Plaintiffs–Appellants,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant–Appellee.**

No. 91–3213.

United States Court of Appeals, Eleventh Circuit.

April 16, 1992.

George W. Estess, Kerrigan, Estess, Rankin & McLeod, Pensacola, Fla., and Talbot D'Alemberte, and Adalber to Jordan,

Steel, Hector & Davis, Miami, Fla., for plaintiffs-appellants.

Elmo R. Hoffman, J. Scott Murphy, Orlando, Fla., William James Reedy, G.H. Small, Jr., Small & White, Atlanta, Ga., and J. Dixon Bridgers, III, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Pensacola, Fla., for defendant-appellee.

Before KRAVITCH, ANDERSON and BIRCH, Circuit Judges.

BIRCH, Circuit Judge:

This diversity case involves the intersection of insurance bad faith law and bankruptcy law. The defendant, St. Paul Fire and Marine Insurance Company ("St. Paul"), is the insurer of Dr. Fariss Kimbell, a neurosurgeon who became bankrupt in late 1986. After the bankruptcy, Dr. Kimbell was found liable for medical malpractice in his treatment of plaintiff Anna Rue Camp. The jury returned a verdict of more than three million dollars, well in excess of Dr. Kimbell's $250,000 policy limits. After the verdict, Camp joined the trustee of Kimbell's bankruptcy estate, plaintiff John E. Venn, in suing St. Paul to recover the excess amount of the verdict. The basis of their lawsuit was St. Paul's alleged bad faith refusal to settle Camp's claim prior to the large judgment.

The United States District Court for the Northern District of Florida granted summary judgment to St. Paul. The court reasoned that because Dr. Kimbell's bankruptcy prior to the verdict prevented Dr. Kimbell's personal liability for any excess judgment, St. Paul's alleged bad faith did

---

not harm its named insured. Therefore, the court concluded that St. Paul could not be sued for bad faith under Florida law. *See Camp v. St. Paul Fire and Marine Ins. Co.*, 127 B.R. 879, 882–86 (N.D.Fla. 1991).

We agree with the district court that the plaintiffs' lawsuit raises issues of first impression under Florida law. *Id.* at 884. We also believe that the resolution of these important questions of law will be determinative of their cause. Accordingly, we certify two questions to the Florida Supreme Court pursuant to Article V of the Florida Constitution. *See* Fla. Const. art. V, § 3(b)(6).

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF FLORIDA PURSUANT TO ARTICLE V, SECTION 3(b)(6) OF THE FLORIDA CONSTITUTION.

TO THE SUPREME COURT OF FLORIDA AND THE HONORABLE JUSTICES OF THAT COURT:

## I. BACKGROUND

### A. *General Factual Background*

The insurance policy issued by St. Paul's in favor of Dr. Kimbell covered the doctor for medical malpractice up to a limit of $250,000 per person injured. The policy also contained this language:

> Once liability has been determined by judgement or by written agreement, the party making the claim may be able to recover under this policy, up to the limits of your coverage. But that party can't sue us directly or join us in a suit against the protected person until liability has been so determined. If the protected person or his or her estate goes bankrupt or becomes insolvent, we'll still be obligated under this policy.

While this policy was in force, Dr. Kimbell performed the procedures which resulted in Camp's injuries. Camp's lawyers threatened to sue Dr. Kimbell for medical malpractice. In July 1984, Dr. Kimbell notified St. Paul about Camp's claim.

St. Paul began the defense of Dr. Kimbell shortly thereafter. On December 10, 1984, Camp sued Dr. Kimbell for medical malpractice in Florida state court. Between the time that Camp's malpractice suit was filed at the end of 1984 and July of 1986, there were two important developments relevant to the present case. First, Dr. Kimbell's financial condition began deteriorating. He had large debts prior to Camp's lawsuit. In addition, the Camp lawsuit, as well as another medical malpractice suit, started to affect the doctor's ability to earn money. Specifically, an investigation of Dr. Kimbell, prompted by the two lawsuits, eventually led to the suspension of Dr. Kimbell's privileges at one of the hospitals where he practiced neurosurgery. That suspension led to fewer referrals, less income, and the concomitant financial instability.

Second, Camp twice offered to settle with St. Paul for Dr. Kimbell's policy limits of $250,000. The settlement requests were made on June 3 and November 5 of 1985. St. Paul rejected both settlement offers. At the time the second offer was rejected, St. Paul was at least aware of Dr. Kimbell's financial difficulties.

In July of 1986, Dr. Kimbell filed a Chapter 7 bankruptcy case in the United States Bankruptcy Court for the Northern District of Florida. Pursuant to the automatic stay of 11 U.S.C. § 362 (1988), Camp's state lawsuit was halted. While Dr. Kimbell's bankruptcy case was proceeding, Camp offered to settle with St. Paul for the policy limits for the third time. On September 19, 1986, St. Paul again rejected settlement. One month later, on November 24, 1986, Dr. Kimbell was granted a discharge order in bankruptcy court, shielding him from any personal liability for claims pending against him as of the date of his bankruptcy filing. During all of this time, St. Paul was researching the question of whether or not Dr. Kimbell's bankruptcy would impact the company's exposure to a potential bad faith suit by Mrs. Camp.

On April 13, 1987, the bankruptcy court modified the stay in Dr. Kimbell's case so as to allow Camp to liquidate her claim

against the doctor. However, the bank-ruptcy court specifically ruled that any judgment obtained by Camp in her state court lawsuit would not be enforceable against Dr. Kimbell personally. In May 1987, St. Paul rejected a fourth offer by Camp to settle for the $250,000 policy lim-its. Although after this fourth rejection St. Paul offered to settle for amounts low-er than the policy limits, the parties could not agree and Camp's case proceeded to trial. Mrs. Camp won a verdict of more than three million dollars on June 25, 1987. This judgment was affirmed on appeal. *Kimbell v. Camp*, 532 So.2d 1061 (Fla.Dist. Ct.App.1988) (table).

Subsequent to the verdict, the bankrupt-cy court in December of 1988 entered an order allowing the excess of the judgment as a general, non-priority unsecured claim against Dr. Kimbell's bankruptcy estate. Once again, the bankruptcy court stated that Camp's judgment could not be en-forced against Dr. Kimbell personally. In the Florida state trial court, Dr. Kimbell moved for an order canceling and dis-charging the three million dollar judgment pursuant to Fla.Stat. ch. 55.145 (1991). On January 11, 1989, the lower state court discharged the judgment against Dr. Kim-bell in accordance with this provision of Florida law.

### B. *Procedural Background of the Bad Faith Lawsuit*

On February 3, 1989, the bad faith law-suit filed by Camp and Venn at the end of 1988—the lawsuit that is the subject of this appeal—was removed to the United States District Court for the Northern District of Florida. After discovery, the parties briefed and argued cross-motions for sum-mary judgment. St. Paul's motion for summary judgment relied heavily upon *Fi-delity and Casualty Co. v. Cope*, 462 So.2d 459 (Fla.1985), and *Clement v. Prudential Property & Casualty Ins. Co.*, 790 F.2d 1545 (11th Cir.1986) (interpreting Florida law).

According to St. Paul, *Cope* and *Clement* make it clear that the essence of an insur-ance bad faith claim in Florida is *the named insured's liability for an excess judgment* following the insurance compa-ny's bad faith failure to settle. The reason that some extant exposure to liability in the *insured* is the *sine qua non* of a Florida bad faith claim, St. Paul contended, is that the insurer's duty runs to the *insured*, not to any injured third party. In *Cope* and *Clement*, the named insured was not re-sponsible for an excess verdict, because either the injured third party executed a release of his claims against the named insured (*Cope*) or agreed not to execute on the assets of the named insured (*Clement*). Both cases held that the injured party could not sue the insurance company for bad faith under Florida law, because the named insured had not been harmed by an enforceable excess judgment. *See Cope*, 462 So.2d at 459, 461; *Clement*, 790 F.2d at 1547–48. Evidently, an insurance compa-ny's bad faith liability is extinguished once an insured is released from liability for a judgment in favor of an injured third party.

St. Paul contended that *Cope* and *Clem-ent* required dismissal of the plaintiffs' bad faith claim in this case. Because Dr. Kim-bell received his discharge in bankruptcy well before Camp's state court lawsuit pro-ceeded to trial, the doctor was never liable for the adverse judgment in favor of Mrs. Camp. Moreover, the judgment rendered against Dr. Kimbell was subsequently can-celed and discharged by the Florida circuit court, a discharge which had "the same effect as a satisfaction of judgment." Fla. Stat. ch. 55.145 (1991). Accordingly, St. Paul argued that under *Cope* and *Clement*, it could not be sued by Mrs. Camp or Mr. Venn for bad faith because its named in-sured was never liable for an excess ver-dict.

In their motion for summary judgment, the plaintiffs first relied upon the language of Dr. Kimbell's insurance policy. In par-ticular, the plaintiffs asserted that the doc-tor's policy stated that St. Paul would "still be obligated under th[e] policy" if Dr. Kim-bell went bankrupt or became insolvent. Therefore, they argued, even if *Cope* and *Clement* accurately stated that Florida law precluded bad faith claims when the named insured was not responsible for an excess

judgment, the language of the St. Paul policy (which must be construed against the company) overrode that common law and permitted the plaintiffs' bad faith action against St. Paul. In short, the plaintiffs believed that St. Paul was "still ... obligated" to settle Camp's claim in good faith notwithstanding the bankruptcy of Dr. Kimbell.

The plaintiffs also argued that even if the language of the policy failed to authorize their bad faith suit against St. Paul, *Cope* and *Clement* should not be applied to bar their cause of action merely because of Dr. Kimbell's fortuitous bankruptcy. In essence, the plaintiffs claimed that *Cope* and *Clement* are distinguishable. First, neither case involved the bankruptcy of the named insured. Instead, in both cases the named insured was voluntarily released from liability for the excess judgment by the injured third party. Second, in neither *Cope* nor *Clement* were there any other adverse consequences to the named insured from the alleged bad faith of the insurance company. Here, in contrast, there may be other adverse consequences to Dr. Kimbell, in so far as his bankruptcy estate remains liable for the excess judgment. Finally, the plaintiffs argued, importing *Cope* and *Clement* wholesale into the bankruptcy context would be ill-advised. Under a regime in which a named insured's bankruptcy insulated all bad faith exposure, insurance companies might have an incentive to contribute to the named insured's bankruptcy, or might refuse to settle clearly legitimate claims if the named insured's bankruptcy was imminent or even possible.

Although the district court found that there were questions of fact regarding St. Paul's alleged bad faith failure to settle, the court agreed with St. Paul's legal analysis and accordingly awarded the insurer summary judgment. The court wrote:

> [T]he insurer's duty of good faith runs to the insured alone, as the *Cope* opinion makes very clear. As the Supreme Court of Florida indicated, the bankruptcy estate's cause of action is entirely derivative of the insured's, and is extinguished once the insured is released from obligations stemming from the underlying judgment. The underlying judgment could not be more clear: Kimbell was never personally liable for the excess judgment. Under the law of Florida, his discharge in bankruptcy had the effect of "satisfying" that judgment with respect to him. Further, the discharge was well before trial and long before judgment was entered. As the bankruptcy judge's order makes perfectly plain ..., any judgment in the *Camp* litigation "shall not be enforceable against the Debtor as a personal liability." Therefore, Kimbell was, before trial, "released from liability for any damages he might have suffered as a result of the insurer's bad faith." *See Clement, supra,* 790 F.2d at 1548. As a result, *Cope* and *Clement* control, and St. Paul cannot be liable for any alleged bad faith in defending Dr. Kimbell.

*Camp,* 127 B.R. at 883–84. As for the specific bankruptcy language of Dr. Kimbell's policy, the court believed that the clause either "[did] not affect the application of the law of Florida and the particular way the judgment was entered in accordance with that law" or only referred to "St. Paul's duty to defend Kimbell and to pay off its claim up to the policy limits...." *Id.* at 885.

The plaintiffs appealed from the district court's order granting St. Paul summary judgment. On appeal, the parties have pressed the same arguments considered by the district court.

## II. REASONS FOR CERTIFICATION

This case obviously involves important questions of unresolved Florida law. *Cope* appears to have relevance, but is not directly on point because it did not involve the bankruptcy of the named insured. Moreover, there may be indications that the lower Florida courts are retreating from the rationale of *Cope*. *See, e.g., Shook v. Allstate Ins. Co.,* 498 So.2d 498, 499–500 (Fla.Dist.Ct.App.1986) (distinguishing *Cope* and allowing the bad faith suit even though the named insured had been released from

liability by the injured third party's agreement not to execute), *review denied,* 508 So.2d 13 (Fla.1987); *Clauss v. Fortune Ins. Co.,* 523 So.2d 1177, 1178 & n.3 (Fla.Dist. Ct.App.1988) (allowing, without discussion, injured party's bad faith claim despite the prior bankruptcy of the named insured).

As for the question of the language of Dr. Kimbell's insurance policy, Florida has never addressed the issue. Although it is unclear whether the bankruptcy clause in Dr. Kimbell's policy will overcome the principle clearly articulated in *Cope,* we note that other jurisdictions have shown some willingness to allow bad faith suits when the insurance policy contained similar language. *See, e.g., Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554, 563–64 (Mo.Ct. App.1990) (Missouri law) (permitting bad faith claim despite named insured's bankruptcy because the "policy contained a provision that bankruptcy or insolvency of the insured or his estate would not relieve [the company] of any obligation"); *Torrez v. State Farm Mut. Auto. Ins. Co.,* 705 F.2d 1192, 1197–1201 (10th Cir.1982) (New Mexico law) (permitting the bad faith claim despite bankruptcy); *Maguire v. Allstate Ins. Co.,* 341 F.Supp. 866, 869–71 (D.Del.1972) (Delaware law) (same). *But see Harris v. Standard Accident and Ins. Co.,* 297 F.2d 627, 636 (2d Cir.1961) (New York law) (barring bad faith claim, without regard to insurance policy language, because the named insureds "were insolvent before the excess judgment was rendered, have not paid any part of it, and have been discharged from any future obligation to pay it"), *cert. denied,* 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962).

Accordingly, because of the novelty and importance of the issues raised in this appeal, we certify the following two questions to the Florida Supreme Court.

## III.  QUESTIONS TO BE CERTIFIED

(1) WHETHER, AS A MATTER OF LAW, A NAMED INSURED'S BANKRUPTCY AND DISCHARGE FROM LIABILITY PRIOR TO EXPOSURE TO AN EXCESS JUDGMENT, SUCH THAT THE NAMED INSURED WAS NEVER PERSONALLY LIABLE FOR ANY AMOUNT OF THE JUDGMENT, PRECLUDES AN INJURED PARTY'S OR BANKRUPTCY TRUSTEE'S SUBSEQUENT BAD FAITH CAUSE OF ACTION AGAINST AN INSURANCE COMPANY.

(2) WHETHER, AS A MATTER OF LAW, THE LANGUAGE OF A BANKRUPTCY CLAUSE IN A PARTICULAR INSURANCE POLICY, SUCH AS THE LANGUAGE AT ISSUE IN THIS CASE, CAN AUTHORIZE AN INJURED PARTY'S OR BANKRUPTCY TRUSTEE'S BAD FAITH ACTION AGAINST AN INSURANCE COMPANY, NOTWITHSTANDING THE FACT THAT THE NAMED INSURED WAS NEVER PERSONALLY LIABLE FOR ANY AMOUNT OF AN EXCESS JUDGMENT DUE TO THE NAMED INSURED'S BANKRUPTCY.

We do not intend the particular phrasing of these questions to limit the Florida Supreme Court in its consideration of the problems posed by this entire case.  In answering the certified questions, the Florida Supreme Court may wish to consider whether or not different answers would be appropriate if the evidence demonstrated that the conduct of the insurance company either caused or contributed to the named insured's bankruptcy.  In addition, the proper resolution of the certified questions may require an interpretation of Fla.Stat. ch. 624.155 (1991).  The plaintiffs have contended that because this chapter authorizes "[a]ny person" to bring a bad faith action against an insurance company, *id.* ch. 624.-155(1), Mrs. Camp's lawsuit is not derivative of Dr. Kimbell's right of action and therefore not dependent upon his prior exposure to liability.  In order to assist consideration of the case, the entire record, along with the briefs of the parties, shall be transmitted to the Supreme Court of Florida together with this certification.

QUESTIONS CERTIFIED.